**THE CANADA LIFE ASSURANCE COMPANY, Plaintiff,**

v.

**CONVERIUM RÜCKERVERSICHERUNG (DEUTSCHLAND) AG, f/k/a Zürich Rückversicherung (Köln) AG, Defendant.**

**No. 01 CIV. 11767(WHP).**

United States District Court, S.D. New York.

April 19, 2002.

Vincent J. Vitkowsky, Edwards & Angell, New York, NY, John H. Mathias, Jr., Jenner & Block, LLC, Chicago, IL, for Plaintiff.

Richard Mancino, Willkie Farr & Gallgher, New York, NY, for Defendant.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

This is a case of first impression concerning the jurisdictional reach of the Air Transportation and System Stabilization Act ("Air Stabilization Act"). Pub.L. No. 107–42, 115 Stat. 230 (Sept. 22, 2001) (amended by the Aviation and Transportation Security Act, Pub.L. No. 107–71, 115 Stat. 597 (Nov. 19, 2001) ("Aviation Security Act")). This action involves a dispute between two foreign reinsurance companies concerning reinsurance claims resulting from the September 11th terrorist attacks. Defendant Converium Rückerversicherung (Deutschland) Ltd. ("Converium")[1] moves to dismiss plaintiff The Canada Life Assurance Company's ("Canada Life") complaint for lack of subject matter jurisdiction, or in the alternative, to dismiss or stay the action and compel arbitration. Canada Life moves for an order requiring Converium to post a bond. For the reasons set forth below, Converium's motion to dismiss the complaint for lack of subject matter jurisdic-

---

1. In 2001, Zürich Rückversicherung Köln AG ("ZRK") was the original defendant in this action. Through a series of corporate transactions, ZRK became a subsidiary of Converium Germany and currently operates under the Converium trade name. (Def.'s Mem. in Supp. at 1.) On March 20, 2002, the parties stipulated to amending the caption in this action to name Converium as the defendant.

tion is granted and thus this Court may not consider Canada Life's motion to require a bond.

### Background

Canada Life is a Canadian reinsurance corporation accredited in New York State. (Compl.¶ 4.) Converium is a German reinsurance corporation. (Compl.¶ 4.) Reinsurance is a business arrangement where primary insurers transfer or "cede" their risks of loss from the contracts they sell. Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 15.01[a] (9th ed.1998); Graydon S. Staring, *Law of Reinsurance* § 1:1 (1993).

Typically, an insurance company pays a certain percentage of the premiums it collects to a reinsurer in exchange for that reinsurer's promise to be responsible for the same percentage of the potential losses on the specified policies of the primary insurer. This paradigm is known as "quota-share" reinsurance. Ostrager & Newman, *supra* § 15.02[a]; Staring, *supra* § 2:4. As such, reinsurance is simply "insurance for insurance companies." *Continental Casualty Co., v. Stronghold Ins. Co.,* 77 F.3d 16, 20 (2d Cir.1996).

Reinsurance companies, in turn, may reduce their exposure to potential losses by diversifying their underlying obligations among other reinsurers. Reinsurance involving a reinsurer's purchase of another reinsurer's obligations is known as retrocessional reinsurance, with the additional reinsurer referred to as a retrocessionaire. Ostrager & Newman, *supra* § 15.01[c](4); Staring, *supra* § 1:1.

During 2000 and 2001, Converium participated in two reinsurance facilities managed by Insurance Service Associates, Ltd. ("ISA"). (Compl.¶ 12.) The ISA facilities are part of a network of insurance companies through which the insurance industry distributes certain risks of loss. Those facilities enabled Canada Life to reduce its exposure on its portfolio of reinsurance contracts by ceding portions of the contracts' premiums and risk of losses to Converium and other retrocessionaires. (Compl.¶¶ 12, 14.) The facilities' co-participants agreed to indemnify Canada Life and assumed their share of premiums pursuant to "quota-share retrocession reinsurance agreements." (Compl.¶ 14.) Canada Life alleges that from 2000 to 2001, its quota-share retrocession reinsurance agreements with Converium provided that Canada Life would retain approximately 28 percent of the premiums with commensurate risk of loss on each reinsurance contract. Converium's alleged share of the premiums and risk of loss on each underlying reinsurance contract written by ISA ranged from 20 to 25 percent. (Compl.¶¶ 14–15.)

On September 11, 2001, the terrorist hijackings and resulting aircraft crashes in New York, Virginia and Pennsylvania claimed more than 3,000 lives. *See* Eric Lipton, *A New Count of the Dead, But Little Sense of Relief,* N.Y. Times, Dec. 2, 2001, at A41. The September 11th attacks impacted many of the ISA facilities' participants, including Canada Life, by precipitating claims under the numerous catastrophe, occupational accident, personal accident, group life and abnormal mortality loss policies for which the ISA facilities held reinsurance policies. (Compl.¶ 13.) "Those original insurance losses have included workers' compensation and life benefits claims by the families of employees of the Fire Department of the City of New York, Marsh & McLennan, . . . [and] Cantor Fitzgerald . . . [among others]." (Compl.¶ 13.) Through the ISA facilities, Canada Life has been paying primary insurers responsible for the claims made under those policies. (Compl. ¶ 13.)

On December 12, 2001, Canada Life filed this action alleging that Converium breached the quota share retrocession agreements by failing to indemnify its full percentage share of Canada Life's September 11th losses and by failing to post an $82.4 million letter of credit for its liability pursuant to the ISA facilities' underlying agreements. (Compl. ¶¶ 16–19.)

Ten days after the terrorist attacks, Congress enacted the Air Stabilization Act, which President Bush signed into law on September 22, 2001. The Air Stabilization Act was meant to bolster an airline industry reeling from the horrific events of September 11th. 147 Cong. Rec. S9589 (Sept. 21, 2001) (remarks of Sen. Hutchinson). As part of that legislation, Congress created a federal cause of action for certain litigation "arising out of" the events of September 11th. Specifically, the Act provided in Section 408(b):

(1) Availability of action. There shall exist a Federal cause of action for damages arising out of the hijacking and subsequent crashes of American Airlines flights 11 and 77, and United Airlines flights 93 and 175, on September 11, 2001. Notwithstanding section 40120(c) of title 49, United States Code [49 U.S.C.A. § 40120(c) ], this cause of action shall be the exclusive remedy for damages arising out of the hijacking and subsequent crashes of such flights.

(2) Substantive law. The substantive law for decision in any such suit shall be derived from the law, including choice of law principles, of the State in which the crash occurred unless such law is inconsistent with or preempted by Federal law.

(3) Jurisdiction. The United States District Court for the Southern District of New York shall have original and exclusive jurisdiction over all actions brought for any claim (including any claim for loss of property, personal injury, or death) resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001.

Air Stabilization Act § 408.

On November 19, 2001, the Air Stabilization Act was amended by the Aviation Security Act. Pub.L. No. 107–71, 115 Stat. 597 (Nov. 19, 2001). Relevant to the issue here, the Aviation Security Act excluded "civil actions to recover collateral source obligations" from the grant of jurisdiction in Section 408(b). Aviation Security Act § 201(b)(3).

Canada Life asserts that this Court has jurisdiction over this action pursuant to Section 408(b)(3) of the Air Stabilization Act's grant of "original and exclusive jurisdiction over all actions brought for any claim . . . resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001" to the Southern District of New York. Converium counters that the grant of jurisdiction under the Air Stabilization Act does not reach the reinsurance dispute at issue here, but applies "to the narrow class of claims for which Congress created a federal cause of action in subsection 408(b)(1)—i.e., only to claims . . . for 'damages arising out of the hijacking and subsequent crashes of September 11th.' " (Def.'s Mem. in Supp. of Mot. to Dismiss at 11.) Converium further asserts that "any broader application of subsection 408(b)(3) as an independent ground of jurisdiction would raise substantial constitutional concerns under Article III of the United States Constitution." (Def.'s Mem. in Supp. of Mot. to Dismiss at 11.) Thus, the issue before this Court is the jurisdictional reach of Section 408(b)(3). Implicit in that question is whether Congress intended Section 408(b)(3) to include retrocessional reinsurance disputes, and if so, whether

such a conferral of jurisdiction is constitutional.

### Discussion

#### I. Motion to Dismiss Standards

On a motion to dismiss pursuant to Rule 12(b)(6), a court typically must accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor. *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998). A court should not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *accord Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir.1995). Dismissal is proper when the plaintiff fails to plead the basic elements of a cause of action. *See Wright v. Giuliani*, No. 99 Civ. 10091(WHP), 2000 WL 777940, at *4 (S.D.N.Y. June 14, 2000).

#### II. Principles of Statutory Interpretation

When interpreting a statute's terms, courts first must look to the language of the statute itself. *See Auburn Housing Auth. v. Martinez*, 277 F.3d 138, 143 (2d Cir.2002) (citing *Mallard v. United States Dist. Court*, 490 U.S. 296, 300, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989) and *In re Boodrow*, 126 F.3d 43, 49 (2d Cir.1997)); *see also Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, ――, 122 S.Ct. 941, 950, 151 L.Ed.2d 908 (2002) (statutory construction begins with analyzing the plain meaning of the statute's language). "Where the statutory language provides a clear answer, it ends there as well." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) (citation omitted); *accord Natural Res. Def. Council, Inc. v. Muszynski*, 268 F.3d 91, 98 (2d Cir.2001).

If the statutory language is ambiguous, a court may resort to the canons of statutory interpretation and to the statute's legislative history to resolve the ambiguity. *Auburn Housing*, 277 F.3d at 143–44. "Statutory construction ... is a holistic endeavor. The meaning of a particular section in a statute can be understood in context with and by reference to the whole statutory scheme, by appreciating how sections relate to one another. In other words, the preferred meaning of a statutory provision is one that is consonant with the rest of the statute." *Auburn Housing*, 277 F.3d at 144 (citations omitted); *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of that statute as a whole."); *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."); *Castellano v. City of New York*, 142 F.3d 58, 67 (2d Cir.1998) ("Where the language is ambiguous, [courts] focus on the 'broader context' and the 'primary purpose' of the statute.")

"[O]nce the tyranny of literalness is rejected, all relevant considerations for giving a rational content to the words become operative. A restrictive meaning for what appear to be plain words may be indicated by the Act as a whole [or] by the persuasive gloss of legislative history ...." *United States v. Witkovich*, 353 U.S. 194, 199, 77 S.Ct. 779, 1 L.Ed.2d 765 (1957). Courts should resort to legislative history if an open question exists "as to the meaning of a word or phrase in a statute, or more

generally because of that statute's silence on an issue of fundamental importance to its correct application." *Jones v. Senkowski,* No. 00–2145, 2002 WL 246451, at \*2 (2d Cir. Feb.21, 2002); *see also* A. Raymond Randolph, *Dictionaries, Plain Meaning, and Context in Statutory Interpretation,* 17 Harv. J.L. & Pub. Pol'y 43, 43 (1988) ("Legislative history may be useful in filling the gap. The history can supply information about how the statute is expected to operate, what subjects it addresses, what problems it seeks to solve, what objectives it tries to accomplish, and what means it employs to reach those objectives—all of which the judge may draw upon in testing his tentative construction of the statutory language.").

■ When the statute under review creates jurisdiction for a federal action, courts must construe that statute "with precision and with fidelity to the terms by which Congress has expressed its wishes." *Bread Political Action Comm. v. Fed. Election Committee,* 455 U.S. 577, 580, 102 S.Ct. 1235, 71 L.Ed.2d 432 (1982); *see also Conoco Inc. v. Skinner,* 781 F.Supp. 298, 303 (D.Del.1991) (jurisdictional statutes must be precisely construed to reflect Congress's intent because judicial power is dependent on the Constitution or such enabling legislation).

## III. *The Air Stabilization Act*

Canada Life asserts that Section 408(b)(3)'s broad language encompassing "any claim . . . resulting from or relating to" necessitates a finding of jurisdiction. (Pl.'s Mem. in Opp. at 9–10.) However, as Canada Life recognizes, the scope of Section 403(b)(3) cannot be determined without looking beyond that specific subsection. (Pl.'s Mem. in Opp. at 10–12 (considering Section 403(b)(3)'s statutory context).) Indeed, when read "in context with and by reference to the whole statu-

tory scheme," *Auburn Housing,* 277 F.3d at 144, Section 408(b)(3)'s language is sufficiently ambiguous to warrant consulting its legislative history. Examined in its overall context, and against the backdrop of its legislative history, it is clear that Congress did not intend Section 408(b)(3) to confer jurisdiction over the dispute at issue here.

Congress promulgated Section 408 as part of Title IV of the Air Stabilization Act. As intimated by Title IV's alternative title, the "September 11th Victim Compensation Fund of 2001," the litigation that Title IV encompasses concerns individuals' lawsuits for damages. *See* Pub.L. No. 107–42, § 401; *see also Connecticut v. United States Dep't of the Interior,* 228 F.3d 82, 88 (2d Cir.2000) (noting that although courts may not rely on chapter titles to define statutory subsections, in the event that a statute's language is ambiguous, "resort to chapter titles, as well as to other tools of statutory interpretation is appropriate").

Congress enacted Title IV "to provide compensation to any individual (or relatives of a deceased individual) who was physically injured or killed as a result of the terrorist-related aircraft crashes of September 11, 2001." Air Stabilization Act § 403. A Title IV "claimant" is any *individual* filing a claim for compensation under Section 405(a)(1). Air Stabilization Act § 402(3) (emphasis added). In addition, Section 405 promulgates a detailed administrative procedure for determining whether such individuals are "eligible individual[s]," and if so, the amount of compensation to which that claimant is entitled. Air Stabilization Act § 405(b)(1). Claimants are required to complete a specially developed claim form detailing

(i) information from the claimant concerning the physical harm that the claimant suffered or . . . information confirming the decedent's death, as a

result of the terrorist-related aircraft crashes of September 11, 2001; (ii) information from the claimant concerning any possible economic and noneconomic losses that the claimant suffered as a result of such crashes; and (iii) information regarding collateral sources of compensation the claimant has received or is entitled to receive as a result of such crashes.

Air Stabilization Act § 405(a)(2)(B).

From that information, a "special master" must determine whether the claimant is an "eligible individual." An "eligible individual" is defined as -

(A) an individual who-(i) was present at the World Trade Center, ... the Pentagon ... or the site of the aircraft crash at Shanksville, Pennsylvania at the time, or in the immediate aftermath, of the terrorist-related aircraft crashes of September 11, 2001; and (ii) suffered physical harm or death as a result of such an air crash;

(B) an individual who was a member of the flight crew or a passenger on [one of the hijacked airliners], except [for] an individual identified ... to have been a participant or conspirator in the terrorist-related aircraft crashes of September 11, 2001, or a representative of such individual; or

(C) in the case of a decedent who is an individual described in subparagraph (A) or (B), the personal representative of the decedent who files a claim on behalf of the decedent.

Air Stabilization Act § 405(c)(2). Title IV further provides that "[n]ot more than one claim may be submitted under [Title IV] by an individual or on behalf of a deceased individual." Air Stabilization Act § 405(c)(3).

As amended, Section 408, titled "Limitation on Liability," addresses the overall exposure of the airlines and other industries affected by September 11th. Section 408(a) provides in part that

liability for all claims, whether for compensatory or punitive damages or for contribution or indemnity, arising from the terrorist-related aircraft crashes of September 11, 2001, against an air carrier, aircraft manufacturer, airport sponsor, or person with a property interest in the World Trade Center, on September 11, 2001, whether fee simple, leasehold or easement, direct or indirect, or their directors, officers, employees, or agents, shall not be in an amount greater than the limits of liability insurance coverage maintained by that air carrier, aircraft manufacturer, airport sponsor, or person.

Aviation Security Act § 201(b)(2) (amending the Air Stabilization Act § 408(a)).[2] Section 408(b) establishes the parameters under which a federal cause of action for damages arising out of the hijackings may be litigated in federal court. Air Stabilization Act §§ 408(b)(1)-(2).

Canada Life stresses that Section 408(b)(3) employs much broader language than the other provisions of Section 408 and argues that that disparity dictates an expansive reading of the jurisdiction conferred under Section 408(b)(3). As noted by Canada Life, Section 408(b)(1) creates a federal cause of action "for damages arising out of the hijacking and subsequent crashes of American Airline flights 11 and 77, and United Airlines flights 93 and 175,

---

**2.** Originally, Section 408 was titled "Limitation on Air Carrier Liability," and provided in subsection (a) that "liability for *all* claims, whether for compensatory or punitive damages, arising from the terrorist-related aircraft crashes of September 11, 2001, *against any air carrier* shall not be in an amount greater than the limits of the liability coverage maintained by the air carrier." Air Stabilization Act § 408(a) (emphasis added).

on September 11, 2001," and Section 408(b)(2) provides a means for determining the "substantive law in any such suit." In contrast, Section 408(b)(3) grants "original and exclusive jurisdiction over *all* actions brought for *any* claim (including any claim for loss of property, personal injury, or death) *resulting from or relating to* " September 11th's terrorist acts. Air Stabilization Act § 408(b)(3) (emphasis added). Canada Life asserts that the disparity between those sections dictates a finding of jurisdiction for its indemnification claim. The overall context of the Air Stabilization Act as viewed through the lens of its legislative history, however, warrants a far more limited jurisdictional scope.

Senator Schumer commented that Congress intended all civil suits arising from September 11th to be situated in the Southern District and not "just lawsuits against the airlines." 147 Cong. Rec. S9592 (Sept. 21, 2001) ("The intent here is to put all civil suits arising from the tragic events of September 11 in the Southern District."); *see also* 147 Cong. Rec. S9599 (Sept. 21, 2001) (remarks of Sen. McCain) (Section 408(b)(3) provides that "all legal cases stemming from these incidents will be consolidated in the United States District Court for the Southern District of New York"). As further explained by Senator Hatch, Section 408(b)(3)'s consolidation of "all legal cases stemming from [September 11th] . . . in the Southern District of New York" was designed to protect non-airline defendants against suits by individuals. Senator Hatch commented that Section 408(b)(3) intended

> to protect the liability of other defendants in potential litigation. If we do

not, then we very likely will place other defendants in a worse position than if we do nothing at all. For instance, under the legal principle of joint and several liability, even if a nonairline defendant is only 10 percent liable and the airline is determined to be 90 percent liable, the nonairline defendant may be required to pay more than its share of liability because the airline's policy limits have been exceeded in the judgment .... I am talking about the airline contractors and subcontractors as well as the companies that built the planes, the port authorities, and even those that built the World Trade Center itself. For those who seek to pursue the litigation route, I am pleased that we consolidated the causes of action in one Federal court so that there will be some consistency in the judgments awarded.

147 Cong. Rec. S9595 (Sept. 21, 2001) [3]; *see also* 147 Cong. Rec. S9594 (remarks of Senator McCain) (the twofold purpose of the Air Stabilization Act is to remove the "the specter of devastating potential liability from the airlines" and guaranteeing compensation for September 11th's "victims and their families").

Moreover, adopting Canada Life's interpretation of Section 408(b) would create a legislative anomaly in the Air Stabilization Act. The November, 2001 amendments to the Air Stabilization Act excepted from 408(b) all "civil actions to recover collateral source obligations." Aviation Safety Act § 201(b)(3) (amending the Air Stabilization Act § 408(c)). That exclusion applies to "all collateral sources, including life insurance, pension funds, death bene-

---

**3.** Senator Hatch's view was later echoed in deliberations over a November amendment to the Air Stabilization Act. In that session, Representative Conyers noted that the Air Stabilization Act provided a two-track compensation system where "individuals" could make an application to the victim compensation fund or pursue a more traditional tort claim based on negligence. "But if the claim is against [an airline], it must be brought in the District Court of the Southern District of New York, where all the cases are to be consolidated." 147 Cong. Rec. H7644 (November 1, 2001).

fits programs, and payments by Federal, State, or local governments related to the terrorist-related aircraft crashes of September 11, 2001." Air Stabilization Act § 402(4). At oral argument, Canada Life conceded that its rights derive, at least "on a pragmatic basis," from claims for underlying collateral sources. (Transcript of Oral Argument, dated April 11, 2002, at 33–34.) Finding that jurisdiction exists here would permit reinsurers like Canada Life to avail themselves of Section 408(b)'s jurisdictional grant even though the underlying obligees, namely victims of the terrorist attacks or their representative, have no such right. Thus, Canada Life asks this Court to extend jurisdiction beyond the point where Congress already has broken the chain.

While Section 408(b)(3) may apply broadly to actions filed by the individual victims of September 11th, its scope is not so sweeping as to apply to the dispute between reinsurers at issue here. Accordingly, Converium's motion to dismiss Canada Life's complaint for lack of subject matter jurisdiction is granted.[4]

### Conclusion

Converium's motion to dismiss the complaint for lack of subject matter jurisdiction is granted. Since this Court has no subject-matter jurisdiction, it lacks the authority to consider Canada Life's motion to require Converium to post a bond. The Clerk of the Court is directed to close this case.

SO ORDERED.

---

**4.** The absence of subject matter jurisdiction over this dispute obviates any need to address the constitutional thicket of "arising under" jurisdiction raised by Converium. *See, e.g., The Propeller Genesee Chief v. Fitzhugh,* 53 U.S. (12 How.) 443, 451–53, 13 L.Ed. 1058 (1900) (statute granting maritime jurisdiction over vessels on the Great Lakes could not support "arising under" jurisdiction).