Christopher GRAYBILL, Plaintiff,

v.

THE CITY OF NEW YORK and Port Authority of New York and New Jersey, Defendants.

No. 02 Civ.684 AKH.

United States District Court, S.D. New York.

Sept. 11, 2002.

**346**

David Jaroslawicz, Jaroslawicz & Jaros, New York City, for Christopher Graybill.

Joseph John Prisco, Malapero & Prisco, New York City, for City of New York.

Gerald S. Crowley, Law Dept. of Port Auth. of New York & New Jersey, New York City, for Port Authority of New York and New Jersey.

### MEMORANDUM OPINION AND OR-DER DENYING JURISDICTION AND REMANDING TO STATE COURT

HELLERSTEIN, District Judge.

Plaintiff Christopher Graybill filed suit in New York Supreme Court against the City of New York and the Port Authority of New York and New Jersey for injuries caused to him as a construction worker when, in cleaning debris from the site of the destroyed World Trade Center, a steel beam struck and injured him. Defendant Port Authority removed the action to federal court pursuant to 28 U.S.C. § 1441 *et seq.*, alleging that the case falls under Section 408(b)(3) of the Air Transportation Safety and System Stabilization Act,

Pub.L. No. 107–42, 115 Stat. 230 (2001), which provides that the Southern District of New York shall have exclusive jurisdiction over claims "resulting from or relating to the terrorist-related aircraft crashes" of September 11, 2001. On my suggestion, the parties briefed and argued the issue of federal jurisdiction, defendants in support of jurisdiction, and plaintiff in opposition.

I hold that federal jurisdiction does not lie in this case. Congress did not intend to oust state court jurisdiction in cases such as this involving injuries common to construction and demolition sites generally, and risks and duties not alleged to be particular to the special conditions caused by the terrorist-related aircraft crashes of September 11. I therefore remand this case to state court under the authority of 28 U.S.C. § 1447(c).

### *Factual Background*

The terrorist attacks on New York of September 11, 2001 reduced the twin World Trade Center towers, a once-buzzing building complex, to a scar of twisted metal, pulverized concrete and assorted rubble. The terrible images of the devastated site, with pieces of the WTC facade eerily rising from the debris and fires smoldering for weeks after the collapses, have been indelibly etched into the consciousness of millions of Americans and people worldwide. Plaintiff, a construction worker employed by Grace Industries, was one of the many who went to that nightmare landscape to clean it up. He alleges that he was injured while working to clear the site, when an unattended hydraulic claw machine dropped an unsecured 1,000 pound steel girder into his work area, striking him and causing him permanent injuries. He sues the City and the Port Authority for their alleged negligence in failing to comply with the safety standards

prescribed by New York Labor Law §§ 240 and 241(6).

### The Air Transportation Safety and System Stabilization Act

Ten days after the terrorist attacks of September 11, 2002, Congress enacted the Air Transportation Safety and System Stabilization Act, Pub. L No. 107–42, 115 Stat. 230 (2001) (the "Air Safety Act" or the "Act"). As part of that legislation, Congress created a federal cause of action "for damages arising out of the hijacking and subsequent crashes" and provided exclusive federal jurisdiction in the District Court for the Southern District of New York "over all actions ... resulting from or relating to the terrorist-related aircraft crashes." *See* Air Safety Act, §§ 408(b)(1) & 408(b)(3), respectively.

The Port Authority removed this action from state court on the basis of Section 408(b)(3). The question before me is whether this case was properly removed to federal court, that is, whether this case, alleging site-owners' negligence under Sections 240 and 241(6) of the New York Labor Law, is nevertheless a case "resulting from or relating to the terrorist-related aircraft crashes" of September 11 within the meaning of Section 408(b)(3) of the Air Safety Act.

### Analysis

■ In determining whether or not this case falls under the exclusive jurisdiction provision of the Air Safety Act, I must assure that the scope of federal jurisdiction is not broadened beyond that which Congress intended. *See Bread Political Action Comm. v. Fed. Elections Comm'n,* 455 U.S. 577, 580, 102 S.Ct. 1235, 71 L.Ed.2d 432 (1982) (courts should construe jurisdiction-enabling statutes "with precision and with fidelity to the terms by which Congress expressed its wishes") (citations and internal quotations omitted).

The first step of inquiry is to look at the relevant terms of the statute, to understand what they mean within the statutory context. *See Davis v. Mich., Dept. of Treas.,* 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) ("It is a fundamental cannon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (citing *United States v. Morton,* 467 U.S. 822, 828, 104 S.Ct. 2769, 81 L.Ed.2d 680 (1984); *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 51, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)) ("In expounding a statute, [the Court] must not be guided by a single sentence ... but look to the provisions of the whole, and its object and policy.") (internal quotations and citations omitted).

While the cleaning and demolition work which plaintiff undertook could be understood to have "result[ed] from" or to have been "relat[ed] to" the aircraft crashes of September 11 as those phrases are understood in their common, everyday meaning,[1] it is not clear whether the duties about which plaintiff complains, or the injuries which plaintiff suffered, also "result[ed] from or relat[ed] to" September 11. Those phrases standing alone, unfortunately, do not have a clear meaning or provide a definite direction for application in cases like the one before me. Being neither qualified nor delimited in a mean-

---

1. "Result" implying the consequence or culmination of some sequence of events, and "relate" implying generic association. *See* American Heritage Dictionary (defining "result" as "[t]o come about as a consequence," and "relate" as "[t]o have connection, rela-

tion or reference"); Webster's Revised Unabridged Dictionary (defining "result" as "[t]o proceed ... as a consequence, from ... combination of circumstances," and "relate" as "[t]o stand in some relation; to have concern; to pertain; to refer").

ingful way, those phrases are ambiguous. *Cf. Canada Life Assurance Co. v. Converium Rückerversicherung (Deutschland) AG,* 210 F.Supp.2d 322, 327 (S.D.N.Y. 2002).

The statutory context provides some clarification of the intended scope of the disputed terms. *Auburn Housing Authority v. Martinez,* 277 F.3d 138, 144 (2d Cir.2002) (holding that review of statutory context is necessary when provision is not clear on its face). The Air Safety Act is a multifaceted statute designed to address the most pressing economic and safety issues facing the airlines after September 11, and to provide compensation for the victims of the tragedy. The Act is divided into six titles, each with a specific goal. The first three titles establish an airline stabilization plan that includes, *inter alia,* providing federal aid to the airlines, creating an Air Transportation Stabilization Board to review applications by the airlines for federal assistance, and providing federal reimbursement to the airlines for increased insurance costs. The fourth title establishes a compensation program for the September 11 victims and creates the federal cause of action and the exclusive federal jurisdiction at issue in this case. The fourth title also limits the liability of certain companies and entities for claims arising from September 11. Title V provides government funding for increased air transportation safety, and Title VI provides for separability in case any provision of the Act is held invalid.

Since the Air Safety Act has many components and goals, the terms at issue here are best understood by looking at the specific title in which they are found, Title IV. The fundamental goal of Title IV is apparent both from its caption—"September 11th Victim Compensation Fund of 2001"—and from Section 403, which states that the purpose of Title IV is "to provide compensation to any individual (or relatives of a deceased individual) who was physically injured or killed as a result of the terrorist-related aircraft crashes of September 11, 2001." Title IV satisfies this purpose by creating a victim compensation fund (the "Fund") from which "eligible individuals" can receive compensation for September 11 losses. "Eligible individuals" are defined as individuals (or, in the case of decedents, their representatives) who were on board one of the hijacked airplanes or who were present at the crash site at the time of or in the "immediate aftermath" of the crashes.[2] Thus, Title IV addresses the most immediate victims of the terrorist attacks: those who died on board the hijacked jetliners, those who died or were injured when the jetliners hit the World Trade Center towers and the Pentagon, and those who died or were injured when the World Trade Center tow-

---

**2.** As defined, an "eligible individual" must fall into one of three categories:

(A) [A]n individual who-
(i) was present at the World Trade Center, (New York, New York), the Pentagon (Arlington, Virginia), or the site of the aircraft crash at Shanksville, Pennsylvania at the time, or in the immediate aftermath, of the terrorist-related aircraft crashes of September 11, 2001; and
(ii) suffered physical harm or death as a result of such an air crash;
(B) [A]n individual who was a member of the flight crew or a passenger on American Airlines flight 11 or 77 or United Airlines flight 93 or 175, except that an individual identified by the Attorney General to have been a participant or conspirator in the terrorist-related aircraft crashes of September 11, 2001, or a representative of such individual shall not be shall not be eligible to receive compensation under this title; (C) [I]n the case of a decedent who is an individual described in subparagraph (A) or (B), the personal representative of the decedent who files a claim on behalf of the decedent.
Air Safety Act § 405(c)(2).

ers collapsed.[3] Title IV further provides that individuals who elect to file claims against the Fund have until December 20, 2003 to do so,[4] and that filing a claim for compensation from the Fund waives the individual's right to file a civil lawsuit for September 11 losses against anyone except willful participants in the hijackings. *See* Air Safety Act, §§ 405(c)(3)(B) & 408(c), respectively.

Title IV appears to treat the right to seek compensation from the Fund, and the right to file suits at law, as alternatives. It is plausible, therefore, to interpret the jurisdictional phrase, "resulting from or relating to," as applying only to suits by individuals who also had the right to seek compensation from the Fund, and to consider that the exclusive federal jurisdiction should apply only to such claims. *See, e.g., Int'l Fine Art and Antique Dealers Show Ltd. v. ASU Int'l, Inc.,* 2002 WL 1349733, at * 4–5 (S.D.N.Y. June 20, 2002) (holding that Section 408(b)(3) jurisdiction applies only to claims that could have received compensation from the Fund). But the language of section 408(b)(3) of the Act is general and broad, and is not limited, neither on its face nor by the statutory context, to the class of "eligible individuals" who may seek compensation from the Fund. The Act instead reaches any suit that alleges a claim "resulting from or relating to the terrorist-related aircraft crashes" of September 11, and a district

judge should give effect to that broader jurisdictional grant.

The Act creates a further conceptual difficulty by defining in different terms what is made a federal cause of action, and what is subject to exclusive federal jurisdiction. Section 408(b)(1) of Title IV creates a federal cause of action "for damages *arising out of* the hijacking and subsequent crashes." (Emphasis added.) Section 408(b)(3), on the other hand, confers exclusive federal jurisdiction "over all actions ... *resulting from or relating to* the terrorist-related aircraft crashes" (emphasis added), a phrase that could be either broader or narrower than "arising out of." Congress did not explain these terms, or what it intended by using different phraseology, and the difference in language, between what is to be a federal cause of action and what is to be within the exclusive jurisdiction of the federal court of the Southern District of New York, does not help us understand if the risk of a dropped steel girder "result[ed] from" or "relat[ed] to" the terrorist-related aircraft crashes of September 11.

One final provision to consider is the section limiting liability of certain entities and individuals for September 11 claims. The "Limitation of Liability" section provides in part that

> liability for all claims, whether for compensatory or punitive damages or for contribution or indemnity, arising from the terrorist-related aircraft crashes of

---

**3.** The rules applicable to the Fund (promulgated by Special Master Kenneth Feinberg) prevent plaintiff from recovering for his injuries from the Fund. The Special Master's rules define "immediate aftermath" from Section 405(c)(2)(A)(i) as meaning within 12 hours of the relevant crash, except in the case of rescue workers, who must have been present at one of the disaster sites within 72 hours of the relevant crash. While the Special Master's interpretation of the legislation is not precedential—particularly since the Special

Master was interpreting a different section of the Act than that addressed here—it is still interesting to note that plaintiff is excluded from the Fund, the creation of which was the primary purpose of Title IV.

**4.** The Act provides that eligible individuals have two years after the promulgation of final rules governing the Fund to file for compensation. The final rules were promulgated on December 21, 2001.

September 11, 2001, against an *air carrier, aircraft manufacturer, airport sponsor, or person with a property interest in the World Trade Center,* on September 11, 2001, whether fee simple, leasehold or easement, direct or indirect, or their directors, officers, employees, or agents, shall not be in an amount greater than the limits of liability insurance coverage maintained by that air carrier, aircraft manufacturer, aircraft sponsor, or person.

Aviation and Transportation Security Act, Pub.L. No. 107–71, 115 Stat. 597 (2001), § 201(b) (amending Air Safety Act § 408(a)) (emphasis added).[5] Defendants argue that this section suggests that the jurisdiction-creating provision should be interpreted expansively, so that all claims against entities such as the City and the Port Authority—person[s] with a property interest in the World Trade Center—should come within the jurisdiction created by Section 408(b)(3), so long as the claims are somehow connected to the events of September 11. I do not agree. The Limitation of Liability provision is no more helpful or illuminating in resolving the case before me than is any other section of Title IV or the Act as a whole, and there is no reason to give it special weight. Additionally, the question still remains as to what "arising from" the terrorist-related aircraft crashes means, for that phrase modifies the category of persons who may benefit from the is Limitation of Liability provision.

The ambiguities embedded in the statute are not clarified by the scant legislative history. A review of a statute's legislative history may provide insight as to (i) how the statute was expected to operate, (ii) what subjects the statute addresses, (iii) what problems the statute sought to solve, and (iv) what objectives the statute tries to accomplish. *See Dictionaries, Plain Meaning, and Context in Statutory Interpretation,* 17 Harv. J.L. & Pub. Pol'y 43, 43 (1988) (cited in *Canada Life Assurance Co.,* 210 F.Supp.2d at 327). Although the opinion of an individual legislator are of doubtful utility, *see United States v. O'Brien,* 391 U.S. 367, 384, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it."); *see also Edwards v. Aguillard,* 482 U.S. 578, 637–638, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (Scalia, J., dissenting), a consensus of purpose can sometimes be found, and such a legislative consensus can sometimes aid judicial interpretation. *See, e.g., Consolidated Edison Co. of New York, Inc. v. Pataki,* 292 F.3d 338, 354–355 (2d Cir.2002) (finding consensus in legislative history that subject statute was punitive).

The Air System Safety Act was passed in relative haste—just eleven days after September 11—and its legislative history is scant. The totality of Congressional discussions on the Act can be found at 147 Cong. Rec. S9589–9606 (Sept. 21, 2001) and 147 Cong. Rec. H5884–5917 (Sept. 21, 2001). Most discussion concerned how best to deal with the economic crisis facing the airline industry following September 11.

No discussion among the lawmakers can be found as to the meaning they ascribed to the different phrases of Sections 408(b)(1) and 408(b)(3). Discussion of Title IV focused on providing victims of September 11 the opportunity to forgo litigation in favor of a faster, easier and more definite remedy. To the extent the law-

---

**5.** As originally enacted, Section 408 of the Act limited the liability only of air carriers. *See* Air Safety Act § 408(a).

makers discussed litigation, the comments also exclusively concerned the choice the Act would create. In this regard, the statement of Representative Conyers is typical:

[T]he legislation creates a Federal cause of action for damages arising out of the hijacking and subsequent crashes of September 11, 2001. Thus individuals who elect not to be part of the victim compensation plan under this legislation have recourse of this Federal cause of action to claim damages.

147 Cong. Rec. at H5914 (Sept. 21, 2001); *see also id.* at S9594 and S9599 (remarks of Senator McCain); *id.* at S9602 (remarks of Senator Nickles); and *id.* at H5913 (remarks of Representative Bentsen).

Congressional motivation behind Sections 408(b)(1) and 408(b)(3) is difficult to find in the legislative history, but the few relevant comments show that Congress intended, by consolidating all September 11 suits in one federal court district, to promote efficiency and to protect non-airline defendants against inconsistent and disproportionate results. *See* 147 Cong. Rec. S9592 (Sept. 21, 2001) (remarks of Sen. Hatch); *id.* at S9594 (remarks of Senator McCain). Senator Hatch's comments confirm that the lawmakers wanted to ensure that all possible defendants named in suits for loss due to the hijackings, subsequent crashes, and building damage and destruction would have their cases adjudicated in a single forum. This focus on consistency suggests that federal jurisdiction granted by Section 408(b)(3) and the federal cause of action created by Section 408(b)(1) include claims beyond those that could seek compensation from the Fund. However, despite the lawmakers' professed concern for consistent results, nowhere does the legislative history suggest that any case, however tangentially connected to the events of September 11, should be brought exclusively in the forum provided by Section 408(b)(3). A line must be drawn to include that which Congress intended to reach, and to exclude duties and rights which are traditionally litigated in the state courts and were not substantially affected by the terrorist attacks of September 11.

Accidents at construction sites are common. Laborers work in confined spaces and under great pressures of time, using sophisticated machinery to excavate and erect heavy and unwieldy materials and necessarily depending on the alertness and competence of many others at the worksite, as well as on their own. Although the dangers and pressures of the WTC site may have been greater than most normal construction sites, there was neither argument nor allegation that the accident that resulted in plaintiff's injury was unique to that site or that situation. The state of New York has extensive statutory and regulatory laws governing construction sites and the duties and obligations of site owners to assure safe conditions to the construction workers who toil on their property. New York state courts have developed an expertise in applying these rules to find and apportion liability for accidents of this kind. There is no suggestion in the text of the Air Safety Act, or its legislative history, that Congress intended to displace the traditional functioning of state laws and state adjudicatory bodies in this kind of dispute.

 In coming to this conclusion, I am influenced by the tort concept of proximate causation, which guides judges and juries in deciding how far a tortfeasor's liability stretches. Proximate causation limits a tortfeasor's liability to the expected, natural or foreseeable consequences of his or her wrongful conduct. *Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1044 (2d Cir.1986); *Clark v. New York City*

*Housing Authority,* 277 A.D.2d 338, 717 N.Y.S.2d 216, 217 (2000). In other words, a tortfeasor is liable for the damage or injury that results from or relates to his tortious conduct—hence, the relevance of tort law to the question at hand. Principles of proximate causation teach that tortfeasors are not liable for injuries or damage that occur because of superceding intervening events—that is, events occurring after the original tort that so contribute to the complained-of harm that they cancel out the liability of the original tortfeasor. Despite the rather broad language of the jurisdictional grant in Section 408(b)(3), Congress could not have intended that every possible harm connected to the terrorist crashes of September 11 should be brought into the United States District Court for the Southern District of New York, and proximate causation provides a useful framework for limiting the scope of that provision.

I hold, therefore, that this case falls outside the scope of jurisdiction created by Section 408(b)(3) of the Air Safety Act. Although plaintiff's injuries occurred in the wake of the terrible tragedy of September 11, and on the site most severely affected by that tragedy, the duty of care owed by the site-owners, and the injuries proximately caused by the site-owners' alleged acts of negligence, are common to construction sites generally, and there has been no showing or argument that this case is different. The jurisdiction of this court cannot be invoked merely because the accident took place on the WTC site.

### Conclusion

For the reasons discussed in this Opinion, I hold that the construction injury of which plaintiff complains does not "result[ ] from or relat[e] to" the terrorist attacks of September 11, 2001 within the meaning of Section 408(b)(3) of the Air Safety Act. Removal of this case from state to federal court by defendant Port Authority on the basis of Section 408(b)(3) was therefore improper, and this case is hereby remanded to New York Supreme Court for further proceedings.

The Clerk shall mark this matter as closed.

SO ORDERED.