270 F.Supp.2d 357 (2003)
In re WORLD TRADE CENTER DISASTER SITE LITIGATION.
Thomas Hickey and Francis Hickey, Plaintiffs,
v.
The City of New York and the Port Authority of New York and New Jersey, Defendants.
Johan Bel, William Quinlan, Bertha Quinlan, James Sweeney, Kathleen Sweeney, William D. McCue, and Maureen McCue, Plaintiffs,
v.
The Port Authority of New York and New Jersey, Silverstein Properties, and the City of New York, Defendants.
Clinton Beyer, Joan Beyer, Peter Blake, and Sharon Blake, Plaintiffs,
v.
The Port Authority of New York and New Jersey, Defendant.
Vincent McNally, Gina McNally, Francis Lavery, and Kathryn Lavery, Plaintiffs,
v.
The Port Authority of New York and New Jersey, Defendant.
Joseph Ariola, Colleen Ariola, James Blake, John M. Deneau, Lisa Deneau, Joseph Healy, Janet Healy, George Lamoreaux, Ingrid Lamoreaux, Thomas Magee, Patrick Malloy, Lorimalloy, Jon J. McGillick, Arlene McGillick, Michael Spiller, Leah Spiller, Timothy Villari, Maria Villari, Anthony R. Larosa, Angela Larosa, Roger Danvers, James Mascarella, John F. Taggart, and Theresa Taggart, Plaintiffs,
v.
The Port Authority of New York and New Jersey, Defendant.
James Blake, Timothy Villari, and Maria Villari, Plaintiffs,
v.
The Port Authority of New York and New Jersey, Defendant.
Kim Flechaus, Plaintiff,
v.
The City of New York, Defendant.
Barry J. Albrecht, and two-hundred-fifty-one other plaintiffs listed in Rider "A" annexed hereto, Plaintiffs,
v.
The City of New York, Defendant.
John Baiano, Jack Biggs, John Bonvicino, John BOU, Kevin Brannick, Wayne Brown, Robert Carannante, Victor Carpentier, Alan Ceserano, Michael Conlon, Phyliss Costarella, Gerald Damitz, Anthony Delbianco, Lenny Dinotte, Daniel Donovan, Roy Edwards, Joseph Falcone, Nelson Garcia, Anthony Giordano, Robert Goffredo, Michael Guidicipietro, Rafael Guttierez, Otto Havel HI, Robert Henri, Pelops Irby, Austin Johnson, Jason Keenan, Kevin Kempton, Omar Malave, Daniel Maldonado, John Menoni, Martin Mullaney, Mickey Nardiello, Frank Ozello, John Pankey, *358 Nicholas Parascandola, Vincent Parise, Thomas Perry, Jerry Pizzarello, Juan Rullan, Raymond Russo, John Salomone, George Snyder, Alexis Solomon, and Christian Trembone, Plaintiffs,
v.
The City of New York, Defendant.
Nos. 21 MC 100 (AKH), 02 Civ. 8434 (AKH), 02 Civ. 8092 (AKH), 02 Civ. 8938 (AKH), 02 Civ. 9126 (AKH) to 02 Civ. 9128 (AKH), 03 Civ. 0008 (AKH), 03 Civ. 0034 (AKH), 03 Civ. 0193 (AKH).
United States District Court, S.D. New York.
June 20, 2003.
*360 Lonny Levitz, Kuharski & Levitz, LLP, New York City, Robin M. Wertheimer, Wertheimer Associates, PC, New York City, for Plaintiffs.
Matthew J. Maiorana, Kenneth A. Becker, Gary P. Shaffer, Michael D. Hess, Corporation Counsel of City of New York, New York CityRiehard A. Williamson, Jason T. Cohen, Flemming, Zulack & Williamson, LLP, New York City, for Defendants.
OPINION AND ORDER PARTIALLY GRANTING AND PARTIALLY DNYING MOTIONS TO REMAND CASES TO STATE COURT
HELLERSTEIN, District Judge.
For almost 100 years, New York State, through numerous provisions of its labor laws, has regulated the workplace to ensure safe conditions for employees. See, e.g., N.Y. Lab. Law §§ 200(1), 241(6) (2003). Pursuant to these statutes, approximately 1200 workers involved in the rescue and clean-up efforts following the collapse of the World Trade Center on September 11, 2001 have brought suit against the City of New York ("the City") and the Port Authority of New York and New Jersey ("the Port Authority"). Their claims are that the City and the Port Authority violated the Labor Law by not providing adequate safety equipment and that, because of such violations, the plaintiffs suffered respiratory injuries. They filed their suits in the Supreme Court of the State of New York, County of New York.
The Air Transportation Safety and System Stabilization Act, 49 U.S.C. § 40101 (2003) ("the Act"), provides that all suits "for damages arising out of the hijacking and subsequent crashes" are federal causes of action, and that all claims "resulting from or relating to" those crashes are to be brought exclusively in the United States District Court for the Southern District of New York. See Act § 408(b). The Act also provides for limitations of aggregate liability on the part of the City and the Port Authority with regard to such suits and claims. See Act § 408(a).
Relying on the Act, the City and the Port Authority removed these respiratory injury suits from the Supreme Court to this court. Motions to remand by many of the plaintiffs followed. In this opinion, I decide whether, and to what extent, the Act preempts state law and state-court jurisdiction.
Following September 11, 2001, thousands of workersincluding police officers, firefighters, construction workers, Department of Sanitation employees, and other laborerstoiled at the World Trade *361 Center site and in the surrounding areas. In the first days after the attacks, the activity was aimed at the paramount goal of rescuing survivors. On September 29, 2001, the mandate officially shifted, moving from search for survivors to demolition of the ruined structure and clean-up of the mountain of debris, tasks that continued for approximately eight more months.
I hold that claims for respiratory injury based on exposures suffered at the World Trade Center site between September 11, 2001 and September 29, 2001 "arise out of," "result from," and are "related to" the attacks of September 11, 2001 and must proceed exclusively under the Act and in this court. I also hold that claims based on exposures outside the World Trade Center or after September 29, 2001 fall beyond the pre-emptive reach of the Act, and remain governed by the New York Labor Law, to be applied in the New York Supreme Court as part of its traditional and historic jurisdiction over New York's labor laws, or in this court as part of its supplemental jurisdiction, as shall be determined by additional proceedings before an United States Magistrate Judge.

I. Background
On September 11, 2001, two hijacked airplanes were deliberately flown into the twin towers of the World Trade Center, crippling the buildings, trapping people in the floors above, and causing the buildings to collapse and crush those who had not been able to get away. Secondary fires set off by the blazing jet fuel damaged and caused the collapse of adjacent buildings, burning and crushing even more people. Nearly 3,000 people died. It took three months for the fires beneath the rubble to be extinguished, and another month before they ceased to smolder.
Firefighters and police officers dug frantically midst the burning and smoldering fires and precarious piles of rubble, desperately seeking lives and, when hope to find survivors failed, to locate remains. Demolition workers, Department of Sanitation workers, and volunteers dug by their sides, breaking down huge blocks of steel and concrete, and carting away the debris to designated piers, and by barge to the re-opened New York City landfill in Fresh Kills, Staten Island. There, Sanitation workers, police officers, and others again sifted the rubble, seeking to locate human remains and preserve evidence of the hijackers' crimes.
Many of these rescue and clean-up workers claim that they suffered injuries by breathing the air fouled by toxins and contaminants from the fires and dust without proper respiratory masks and protective equipment, and have sued the City and Port Authority for their failure to provide safety gear and other acts of alleged negligence. Some of the plaintiffs have alleged that they began work on September 11 or soon thereafter and continued to work at the site. Some plaintiffs alleged that they began working on later dates. Some ceased to work relatively early, and some did not leave until the clean-up ended, in May 2002, a period of approximately eight months. Plaintiffs vary in the specificity of their allegations, in the duration of their exposures, and as to the sites where they worked. In all, there are thirty-five suits and more than twelve hundred plaintiffs that are affected by this decision.[1]

A The Air Transportation Safety and System Stabilization Act of2001
The events of September 11, 2001 caused Congress to take immediate action *362 to address the financial crisis in the airline industry and the losses suffered by the victims and their families. On September 22, 2001, President Bush signed into law the Air Transportation Safety and System Stabilization Act of 2001, Pub.L. No. 107-42, 115 Stat. 230 (2001) (codified at 49 U.S.C. § 40101). The Act was subsequently amended on November 19, 2001 and Jan. 23, 2002. See Pub.L. No. 107-71, 115 Stat. 631 (2001); Pub.L. No. 107-134, 115 Stat. 2435 (2002).
Title IV of the Act, captioned "Victim Compensation," provides alternative modes of procedures that may be used by those who suffered injuries or are legal representatives of people who died as a result of the terrorist-related aircraft crashes of September 11, 2001. Sections 403 through 407 of the Act provides for the "September 11th Victim Compensation Fund of 2001," to be administered by an appointed Special Master who makes compensation awards according to criteria established generally by the Act and more specifically by regulations promulgated by the Department of Justice. Eligible claimants must have suffered "physical harm or death as a result of the terrorist-related aircraft crashes, and must have been on the planes or at the World Trade Center, the Pentagon, or the crash site at Shanksville, Pennsylvania "at the time, or in the immediate aftermath, of September 11, 2001." Act § 405(c). Claimants must waive their right to file a civil action (or to be a party to an action) in any federal or state court, except for suits to recover "collateral source obligations" (for example, insurance or other such items which, under the Act, are to be deducted from claims against the Victim Compensation Fund), and except for suits against the hijackers and their co-terrorists. Act §§ 405(c)(3)(B)(i), 408(e).
The alternative mode of recovery is a court suit. Section 408(b)(1) of Title IV provides for a federal cause of action "for damages arising out of the hijacking and subsequent crashes." Section 408(b)(3) provides that such actions are to be brought in the United States District Court for the Southern District of New York, as a matter of its "original and exclusive jurisdiction." The exclusive jurisdiction is to be "over all actions brought for any claim (including any claim for loss of property, personal injury, or death) resulting from or relating to the terroristrelated aircraft crashes of September 11, 2001." Act § 408(b)(3). Section 408(b)(2) provides the governing law for lawsuits brought under the Act; such law is to be "derived from the law, including choice of law principles, of the State in which the crash occurred unless such law is inconsistent with or preempted by Federal law."
Any suits brought are subject to the liability caps enacted in section 408, captioned "Limitation on liability." As originally passed in September 2001, section 408(a)(1) restricted the liability of the affected air carriers to the limits of their insurance. In November 2001, section 408(a)(1) was modified, limiting the exposure of not only the air carriers, but also the aircraft manufacturers, airport sponsors, and persons with a property interest in the World Trade Center to their respective insurance coverages. Section 408(a)(3) was added, capping the liability of the City of New York, "whether for compensatory or punitive damages or for contribution or indemnity arising from the terrorist-related aircraft crashes of September 11, 2001," "to the greater of the City's insurance coverage or $350 million."

B. Procedural Background
I am presiding over two broad categories of lawsuits arising from the terroristrelated aircraft crashes on September 11, 2001: 1) cases alleging wrongful death, *363 personal injury, and property damage against the airlines, the airport security companies, the plane manufacturer, and the owners and lessees of the World Trade Center ("WTC");[2] and 2) cases alleging respiratory injuries against the City of New York, the Port Authority of New York and New Jersey, and the contractors that were engaged to demolish, cart away and clean up the debris of the destroyed buildings.[3] The remand motions at issue here concern this second category of cases.
Thus far, the City and the Port Authority have removed thirty-five cases filed in the New York Supreme Court on the ground that they are subject to the exclusive federal jurisdiction of this court pursuant to the terms of the Act. The complaints allege that the plaintiffsindividuals working as police officers, firefighters, sanitation workers, and demolition and clean-up workers at the World Trade Center site, at transfer sites, on barges that transported the debris, or at Fresh Kills, Staten Island where the debris was deposited in the aftermath of the September 11, 2001 attacksincurred respiratory injuries due to unsafe conditions at their respective work sites. Plaintiffs in nine of these post-September 11 respiratory cases have moved to remand their cases back to the state court. Of these nine cases, three name both the City and the Port Authority as defendants, two name the City alone, and four name the Port Authority alone. Plaintiffs in the other twenty-six removed cases have not made remand motions.[4] However, since these twenty-six cases involve essentially the same issues and similar claims respiratory injuries resulting from exposure during rescue and clean-up work at various sites and at varying timesthe same jurisdictional principles will govern all of these cases, for all were removed from the New York Supreme Court based on section 408 of the Act.
The complaint in Hickey v. City of New York, 02 Civ. 8434, alleges that Thomas Hickey, an employee of a company hired by the City and Port Authority, worked at the World Trade Center site from September 13, 2001 through November 7, 2001, and during that time suffered respiratory injuries due to the defendants' negligence in failing to monitor the "dangerous and hazardous toxic conditions" at the site and to provide adequate respiratory protection. The complaint cites violations of sections 200, 240 and 241(6) of the New York Labor Law, rule 23 of the New York Industrial Code, and Article 1926 of the Occupational Safety and Health Act ("OSHA"). Frances Hickey, Thomas Hickey's wife, sues for the loss of her husband's support and services.
In Bel v. Port Authority of NY. and N.J., 02 Civ. 8092, iron workers employed by a company identified as "Amex" and engaged by the City to do work at the WTC site, bring suit against the City, the Port Authority and Silverstein Properties.[5] The complaint alleges that due to the negligence of the defendants, the iron workers suffered injuries from contact with toxins *364 and other poisons, including asbestos, lead, and benzene. The workers also assert that the defendants are liable for violations of sections 200 and 241 of New York Labor Law. Plaintiffs allege that they began work as follows: Johan Bel, September 18, 2001; William Quinlan, September 12, 2001; James Sweeney, September 14, 2001; and William D. McCue, September 12, 2001. Their spousesBertha Quinlan, Kathleen Sweeney, and Maureen McCue sue for loss of services, society and companionship.
Plaintiffs Clinton Beyer and Peter Blake, operating engineers employed to do demolition and construction at the World Trade Center site, claim that they were exposed to toxic substances resulting from the Port Authority's failure to provide them with proper equipment or monitor the air quality and the defendant's violations of sections 200 and 241 of the New York Labor Law, the Occupational Safety Health Standards, and the Industrial Code. Beyer v. Port Authority ofN.Y. and N.J., 02 Civ. 8938. Clinton Beyer began working at the site on November 15, 2001, and Peter Blake started on October 15, 2001. Plaintiffs Joan Beyer and Sharon Blake sue for loss of consortium.
The complaint in McNally v. Port Authority of N.Y. and N.J., 02 Civ. 9126, alleges that plaintiffs Vincent McNally and Francis Lavery suffered respiratory injuries while working as operating engineers doing demolition and construction beginning on September 21, 2001 and September 29, 2001, respectively, at the WTC site. Plaintiffs Gina McNally and Kathryn Lavery seek damages for loss of consortium.
Ariola v. Port Authority of N.Y. and N.J., 02 Civ. 9127, claims that a number of construction workers, operating engineers and laborers, were injured from toxic exposure to smoke, dust and other airborne contaminants at the World Trade Center site. Plaintiffs allege that they worked at the site as follows: Joseph Ariola, on September 11, 2001 and for 21 days thereafter; James Blake, on September 11, 2001, November 15, 2001, and approximately six months thereafter; John M. Deneau, on September 13, 2001 and 21 days thereafter; Joseph Healy, on September 11, 2001 and for eight months thereafter; George Lamoreaux, on September 16, 2001 and seven weeks thereafter; Thomas Magee, on September 11, 2001 and nine months thereafter; Patrick Malloy, on September 14 through September 21, 2001 and on October 8, 2001 through October 17, 2001; Jon J. McGillick, on September 13, 2001 and two weeks thereafter; Michael Spiller, on September 11, 2001 and eight months thereafter; Timothy Villari, on September 12, 2001 and several weeks thereafter; Anthony Larosa, on September 13, 2001 and ten months thereafter; Roger Danvers, on September 15, 2001 and six months thereafter; James Mascarella, on September 12, 2001 and one month thereafter; and John F. Taggart, on September 12, 2001 and several months thereafter. Their spouses, Colleen Ariola, Lisa Deneau, Janet Healy, Ingrid Lamoreaux, Lori Malloy, Arlene McGillick, Leah Spiller, Maria Villari, Angela Larosa, Theresa Taggart, sue for loss of consortium. Three of the plaintiffsJames Blake, Timothy Villari, and Maria Villarialso are plaintiffs in Blake v. Port Authority of N.Y. and N.J., 02 Civ. 9128, and make similar allegations in that complaint.[6]
Plaintiff Kim Flechaus, a New York City police officer who alleges that she worked at the World Trade Center site from September 11, 2001 through October 9 or 10, *365 2001, claims that she suffered personal injuries from exposure to toxic fumes and gases. Flechaus v. City of New York, 03 Civ. 008. Ms. Flechaus moves both to remand her case to the New York Supreme Court and for leave to amend her complaint to allege that she sustained her personal injuries due to exposure on or about October 8, 9 or 10, 2001.
In Albrecht v. City of New York, 03 Civ. 0034, Barry Albrecht and 251 other plaintiffs, all firefighters and their spouses, filed a summons with notice alleging personal injury resulting from the failure to provide appropriate respiratory protection from toxins. Citing violations of various federal and state laws and regulations, plaintiffs claim that the defendants were negligent and that damages are warranted under New York General Municipal Law 205-a and New York Labor Law §§ 200 and 241(6). The pleading does not state the time period or geographic area in which the plaintiffs worked.
Baiano v. City of New York, 03 Civ. 0193, reflects claims of forty-four employees of the Department of Sanitation of the City of New York for respiratory injuries they allegedly sustained while working at the World Trade Center, the Fresh Kills Landfill in Staten Island, the 59th Street Manhattan and Hamilton Avenue Brooklyn Marine Transfer Stations, and Piers 6 and 25. Plaintiffs allege that they began work on or about September 11, 2001, and that the City was negligent in failing to provide proper equipment, to monitor the air, to warn them of the ultrahazardous nature of their work, and to comply with OSHA, New York State Labor Law, and the New York State Industrial Code.
I consolidated the motions to remand in these nine cases for joint consideration. I also asked the parties to address an interrogatory regarding the possibility of drawing a distinction between federal and state jurisdiction according to the time when or place where the plaintiffs worked, but neither plaintiffs nor defendants suggested any such distinction. Oral argument was held on March 31, 2003. The parties then filed supplemental submissions pursuant to my request for a chronology of material events in the rescue and recovery efforts following September 11, 2001.

C. Prior Decisions
Earlier in this litigation, I decided motions in two cases involving construction workers who had been injured in the course of their demolition and clean-up work at the World Trade Center site. I held that the scope of preemption provided for by section 408 of the Act did not cover their injuries, and I remanded their cases to the New York Supreme Court. See Graybill v. City of New York, 247 F.Supp.2d 345 (S.D.N.Y.2002), and Spagnuolo v. Port Auth. of N.Y. and N.J., 245 F.Supp.2d 518 (S.D.N.Y.2002). I held that Congress did not intend to oust state court jurisdiction in cases involving injuries common to construction and demolition sites generally, such as those sustained by the plaintiffs when they were struck by objects at the site. "Although the dangers and pressures of the WTC site may have been greater than most normal construction sites, there was neither argument nor allegation that the accident that resulted in plaintiffs injury was unique to that site or that situation." Graybill 247 F.Supp.2d at 351. I specifically reserved judgment on whether the Act confers federal jurisdiction in cases brought by plaintiffs alleging risks and duties that could be considered particular to the conditions caused at the World Trade Center site as a result of the September 11 aircraft crashes.

II. Discussion
The Port Authority and the City have removed cases alleging respiratory injuries sustained while working in the *366 rescue, recovery, and clean-up efforts following September 11 based on the Air Transportation Safety and System Stabilization Act. The party seeking to preserve removal, not the party moving for remand, has the burden to show that the removal was properly based on federal jurisdiction. See Grimo v. Blue Cross/Blue Shield, 34 F.3d 148, 151 (2d Cir.1994); Pan Atl. Group, Inc. v. Republic Ins. Co., 878 F.Supp. 630, 637 (S.D.N.Y.1995). Removal statutes are to be construed narrowly and uncertainties are to be resolved in favor of remand, in order to promote the goals of federalism, the limited jurisdiction of federal courts, and the right of plaintiffs to choose the forum in which to bring suit. See, e.g., Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 108-09, 61 S.Ct. 868, 85 L.Ed. 1214 (1941); Somlyo v. J. Lu-Rob Enters., Inc., 932 F.2d 1043, 1045-46 (2d Cir.1991).

A. Doctrine of Complete Preemption
Even when a federal question does not appear on the face of a wellpleaded complaint, the Supreme Court has recognized an "independent corollary" to the well-pleaded complaint rule that provides for federal question jurisdiction: the "complete pre-emption" doctrine. Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 22, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). In narrow circumstances, the pre-emptive force of a statute may be so "extraordinary" that it "converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 65 n. 8, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). "[I]f a federal cause of action completely preempts a state cause of action any complaint that comes within the scope of the federal cause of action necessarily `arises under' federal law." Franchise Tax Bd., 463 U.S. at 24, 103 S.Ct. 2841. Here, because removal was based on section 408(b) of the Air Transportation Safety and System Stabilization Act, 49 U.S.C. § 40101 (2003), defendants bear the burden of establishing that the Act completely preempts the plaintiffs' state law claims pleaded in their complaints, and that exclusive federal jurisdiction is mandated.
Preemption is a doctrine grounded in the Supremacy Clause of the United States Constitution, U.S. Const, art. VI, cl. 2. Pursuant to the Supremacy Clause, a state law that conflicts with a valid federal law is "without effect." Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). To avoid "unintended encroachment on the authority of the States, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption." CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993).
Two general types of preemption have been recognized by the Supreme Court: express and implied. Congress can expressly preempt state law by explicitly providing for the displacement of state law. See Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). Even if Congress does not expressly preempt state law, state law may be impliedly preempted if Congress either 1) has legislated in a particular field so pervasively that no room is left for concurrent state legislation, see id.; or 2) has enacted federal laws that conflict with state laws, see Geier v. American Honda Motor Co., 529 U.S. 861, 873-74, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000). Defendants argue that the Act expressly preempts state law.
Where a statute expressly provides for federal preemption, courts must determine *367 the breadth of that preemption and whether the preemptive force of the federal statute applies to the state law claims presented. If the state cause of action does not fall within the scope of preemption that Congress intended, state law continues to govern and state courts continue to have jurisdiction. See Caterpillar, Inc. v. Williams, 482 U.S. 386, 399, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987) (concluding that state law claims alleging breach of employment agreement were not preempted, even though plaintiffs could have chosen to bring suit under section 301 of the LMRA); Franchise Tax Bd., 463 U.S. at 27-28, 103 S.Ct. 2841. Courts have struggled with this inquiry, "attempting to apply the Supreme Court's still not entirely determinate principles." Gerosa v. Savasta & Co., 329 F.3d 317, 324 (2d Cir.2003).
This struggle has resulted in modifications of the preemption analysis over time. In the ERISA context, Shaw v. Delta Air Lines, Inc. exemplifies a broad reading of preemption in defining what state laws "relate to" ERISA employee benefit plans and are therefore preempted under 29 U.S.C. § 1144(a). In Shaw, the Supreme Court equated the statutory phrase "relate to," with the phrase "has a connection with or reference to," an ERISA-covered plan. 463 U.S. 85, 96-97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). It said: "Congress used the words `relate to' in § 514(a) in their broad sense. To interpret § 514(a) to preempt only state laws specifically designed to affect employee benefit plans would be to ignore the remainder of § 514... [n]or, given the legislative history, can § 514(a) be interpreted to preempt only state laws dealing with the subject matters covered by ERISAreporting, disclosure, fiduciary responsibility, and the like." Id. at 98-99, 103 S.Ct. 2890. In a subsequent case, the Court narrowed this far-reaching approach. The Court found that the broad grant of federal jurisdiction by ERISA cannot be read "as displacing all state laws affecting costs and charges [for hospital rates] on the theory that they indirectly relate to ERISA plans." New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 661, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). The Second Circuit, among other courts of appeals, has noted that "Travelers occasioned a significant change in preemption analysis, and required careful reconsideration of any preexisting precedent dependent on the expansive view of `related to' that held sway before it." Gerosa, 329 F.3d at 327 (citations omitted).
The shifts in preemption analysis suggest that there are no fixed meanings or shorthand rules to demarcate just where the traditional jurisdiction of state courts and application of state law must be ousted. Rather, "preemption must be considered in light of Congress's purposes in enacting the statute." Gerosa, 329 F.3d at 325. Beginning with the presumption that Congress does not intend to displace state law, especially in traditional areas of state control, see Travelers, 514 U.S. at 654-55, 115 S.Ct. 1671, courts go on to weigh whether the central motivations behind the federal law favor preemptionin other words, whether allowing state law to govern would undermine federal control or weaken the protections Congress intended to provide. See Gerosa, 329 F.3d at 328-29. The inquiry requires courts to draw careful distinctions between claims that are preempted and those that may remain in state court. For example, in Cicio v. John Does 1-8, the court found that the plaintiffs claims regarding the untimeliness of a coverage denial by the medical director of an HMO and the misleading nature of the HMO's representations about its health care plan were preempted by ERISA. 321 F.3d 83, 94-97 (2d Cir. 2003). It concluded, however, that plaintiff could challenge the quality of the medical *368 decision made by the HMO and its medical director with respect to the treatment of the insured and the denial of coverage in state court, even though such a claim could be said to relate to or have a connection with the ERISA plan. Because "nothing in ERISA suggests that Congress intended any displacement of `the quintessentially state-law standards of reasonable medical care' as applied to the medical component of a mixed decision," the plaintiff could bring state law medical malpractice claims. Id. at 97-105 (citation omitted). Distinguishing between those claims that are preempted and those that are not will turn on this type of nuanced analysis, comparing the congressional purposes behind the federal law to state law and policy, and measuring the extent to which they conflict or may be harmonized.

B. The Pre-Emptive Scope of Section 408(b) of the Air Transportation Safety and System Stabilization Act
The Air Transportation Safety and System Stabilization Act contains express language of preemption. Section 408(b)(3) gives the United States District Court for the Southern District of New York "original and exclusive jurisdiction over all actions brought for any claim (including any claim for loss of property, personal injury, or death) resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001." Furthermore, the Act creates a federal cause of action "for damages arising out of the hijacking and subsequent crashes of American Airlines flights 11 and 77, and United Airlines flights 93 and 175, on September 11, 2001." Act § 408(b)(1). The substantive law for decision in these suits shall be derived from the law of the state in which the crash occurred, unless such law is "inconsistent with or preempted by Federal law." Act § 408(b)(2). By providing for exclusive federal jurisdiction and a federal cause of action, Congress clearly intended that the claims for injuries "arising out of," "resulting from," or "relating to" the terrorist-related aircraft crashes into the World Trade Center would be federal claims brought only in the United States District Court for the Southern District of New York, preempting the state courts of jurisdiction.
The difficult question is the scope of preemption created by section 408(b)(3) of the Act. Should preemption extend to lawsuits by clean-up and demolition workers who worked at the World Trade Center site months after September 11, 2001? Should preemption extend to claims by Department of Sanitation workers at the Fresh Kills, Staten Island dump site, or at the piers and barges that were used to transport the debris to Fresh Kills? Is there some temporal and geographical limitation, dividing claims between those more immediately, and more distantly, affected by the terrorist-related aircraft crashes of September 11, 2001?

i. Statutory Language and Legislative History of the Act
My inquiry as to what, if any, limits exist to the grant of exclusive federal jurisdiction begins with an analysis of section 408 of the Act. See Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002); Auburn Hons. Auth. v. Martinez, 277 F.3d 138, 143 (2d Cir.2002). "It is axiomatic that the plain meaning of a statute controls its interpretation, and that judicial review must end at the statute's unambiguous terms." In re Venture Mortgage Fund, L.P., 282 F.3d 185, 188 (2d Cir.2002). Individual statutory provisions must be read and interpreted in the context of the statute as a whole.
"Statutory construction ... is a holistic endeavor." The meaning of a particular section in a statute can be understood in context with and by reference to the *369 whole statutory scheme, by appreciating how sections relate to one another. In other words, the preferred meaning of a statutory provision is one that is consonant with the rest of the statute.
Auburn Hous. Autk, 277 F.3d at 144 (citations omitted). See also Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997); K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988). If the meaning of a statute is ambiguous, the court may resort to canons of statutory interpretation in order to resolve the ambiguity and may look to legislative history and statutory purpose to determine the intent of Congress. Auburn Housing Auth., 277 F.3d at 143-44. "A restrictive meaning for what appear to be plain words may be indicated by the Act as a whole [or] by the persuasive gloss of legislative history." United States v. Witkovich, 353 U.S. 194, 199, 77 S.Ct. 779, 1 L.Ed.2d 765 (1957). The Supreme Court has cautioned that statutes "should be interpreted to avoid untenable distinctions and unreasonable results whenever possible." Am. Tobacco Co. v. Patterson, 456 U.S. 63, 71, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982). See also Dougherty v. Carver Fed. Sav. Bank, 112 F.3d 613, 624 (2d Cir.1997). When a statute creates jurisdiction for a federal action, courts must construe the statute "with precision and with fidelity to the terms by which Congress has expressed its wishes." Bread Political Action Comm. v. Fed. Election Comm'n, 455 U.S. 577, 580, 102 S.Ct. 1235, 71 L.Ed.2d 432 (1982).
The varied phrases of the Act providing for the federal cause of action and granting exclusive federal jurisdiction"arising out of," "resulting from" and "relating to"suggest varying meaning and scope, more limited in the context of the phrase "resulting from," more expansive in the context of the phrase "relating to," and perhaps somewhere between in the context of the phrase "arising out of." The phrases, however, shed little light on the scope of federal preemption. As recognized by the Supreme Court, a phrase such as "relate to" could be "taken to extend to the furthest stretch of its indeterminacy," and "for all practical purposes pre-emption would never run its course, for `[r]eally, universally, relations stop nowhere.'" Travelers, 514 U.S. at 655, 115 S.Ct. 1671 (examining section 514(a) of ERISA). To do so "would be to read Congress's words of limitation as mere sham, and to read the presumption against pre-emption out of the law whenever Congress speaks to the matter with generality." Id. The Court's elaboration of "relates to" as having "a connection with or reference to," see, e.g., Morales v. Trans World Airlines, Inc., 504 U.S. 374, 388, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (interpreting the Airline Deregulation Act), and Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (interpreting ERISA), is also unhelpful here; "[f]or the same reasons that infinite relations cannot be the measure of pre-emption, neither can infinite connections." Travelers, 514 U.S. at 656,115 S.Ct. 1671.
I turn next to the scant legislative history. A review of a statute's legislative history may provide insight as to (i) how the statute was expected to operate, (ii) what subjects the statute addresses, (iii) what problems the statute sought to solve, and (iv) what objectives the statute tries to accomplish. See Dictionaries, Plain Meaning, and Context in Statutory Interpretation, 17 Harv. J.L. & Pub. Pol'y 43, 43 (1988) (cited in Canada Life Assurance Co. v. Converium Ruckerversicherung (Deutschland) AG, 210 F.Supp.2d 322, 327 (S.D.N.Y.2002)). Although the opinions of an individual legislator are of doubtful utility, see United States v. OBrien, 391 U.S. 367, 384, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (observing that "[w]hat motivates one legislator to make a speech about a *370 statute is not necessarily what motivates scores of others to enact it"), a consensus of purpose can sometimes be found, and such a legislative consensus can sometimes aid judicial interpretation. See, e.g., Consol. Edison Co. v. PataM, 292 F.3d 338, 354-355 (2d Cir.2002) (finding consensus in legislative history that subject statute was punitive).
In defining the scope of preemption, I must consider the major congressional purposes driving the enactment of Title IV. First, the legislators desired to protect the airlines and other defendants against the potential of extraordinary liability arising from the September 11 aircraft crashes, while preserving also the right of victims to claim compensation, either from a Victim Compensation Fund or through the normal course of litigation. Senator John McCain expressed the concerns:
One of the most difficult issues we had to grapple with was the enormous potential liability that airlines faced if courts determine that [the airlines] were negligent and in some way responsible for the damage wrought by the terrorist attacks last week ... The vast uncertainty of our litigation system posed significant challenges to crafting reasonable limitations on airline liability while providing compensation for the victims of the terrorist attacks and their families. Disturbingly, while courts could order the liquidation of our biggest airlines if they are deemed liable for the catastrophic damage of September 11, victims could also receive no compensation from the courts if they determine that corporate entities, including airlines, were not responsible for the devastating damage arising from the terrorist attacks ... To ensure that the victims and families of victims who were physically injured or killed on September 11th are compensated even if courts determine that the airlines and any other potential corporate defendants are not liable for the harm; if insurance monies are exhausted; or are consumed by massive punitive damage awards or attorneys' fees, the bill also creates a victims' compensation fund. These victims and their families may, but are not required to, seek compensation from the Federal fund instead of through the litigation system.
147 Cong. Rec. S9594 (Sept. 21, 2001). Representative Kenneth Bentsen commented in similar fashion:
This bill would also establish a voluntary Victims Compensation fund so that victims of terrorist-related attacks of September 11 could seek compensation. This Fund would be administered by a Special Master appointed by the Attorney General. Air carrier liability is capped at the carriers' insurance company limit. Any additional liability would be assumed by the federal government. The federal government will provide compensation above this carrier liability. If victims elect to use this compensation program, they would be required to provide that they were damaged by these attacks. For victims who seek compensation through lawsuits, they would also be required to prove that the airlines were negligent and had caused them damage. However, I believe it is important that families ultimately still have the right to seek higher compensation through a legal case.
147 Cong. Rec. H5913 (Sept. 21, 2001).
Another purpose animating Congress in enacting section 408 was to promote efficiency, "to provide some sense to the litigation by consolidating all civil litigation arising from the terrorist attacks of September 11 in one court," to facilitate judicial economy and consistency of rulings, and to bring about prompt and economical determinations of the merits. 147 Cong. Rec. S9594 (Sept. 21, 2001) (statement of *371 Sen. McCain). See also 147 Cong. Rec. S9592 (Sept. 21, 2001) (statement of Sen. Schumer) (stating that "[t]he intent here is to put all civil suits arising from the tragic events of September 11 in the Southern District"); 147 Cong. Rec. S9595 (Sept. 21, 2001) (statement of Sen. Hatch) (noting that "I am pleased that we consolidated the causes of action in one Federal court so that there will be some consistency in the judgments awarded"). Congress thus intended that Title IV would promote the efficiency and rationality of litigation for those victims who chose to sue rather than to file a claim with the Victim Compensation Fund, and would limit the aggregate exposure of the non-terrorist defendants, especially the airlines defendants, to maintain their viability and solvency.
The amendment enacted in November 2001 extended these goals to potential defendants which were not covered by the Act's original provisions.[7] Representative James Sensenbrenner, discussing the House version of the amendment, commented that it "protects the city of New York, its police department, and its fire departmentall of which have conducted themselves so valiantly," and "prevent[s] the prospect of unlimited liability damage awards from turning New York from the nation's financial capital into a business graveyard." 147 Cong. Rec. H7649 (Nov. 1, 2001). He referred to a November 1, 2001 letter submitted by Mayor Rudolph Giuliani in support of the amendment, in which the mayor stated: The amendment "would provide New York with much needed relief from potential liability arising out of the attacks on the World Trade Center on September 11, 2001. Any substitute would fail to provide the City the fiscal protection it needs from potentially limitless lawsuits .... [passage of the bill] would solve one large part of the City's potential liability exposure, and help ensure steady progress toward utilizing our resources to address critical fiscal matters." Id.
Congress was not clear, however, as to the scope of protection that it intended to give to the City. Mayor Giuliani noted in his letter of November 1, 2001, that "the *372 City's urgent need for indemnification in removing debris from the World Trade Center site is not part of this legislation." Only "a large part," but not all, "of the City's potential liability exposure" would be affected. Representative Sensenbrenner also mentioned a letter by Governor Pataki, stating that the "amendment will free the city of New York and the Port Authority" "of undue burdens which could seriously slow or even derail those rebuilding efforts." Id. (emphasis added).

ii Scope of Preemption under Section 408 of the Act
Defendants argue that everything the plaintiffs didwhether at the World Trade Center site or at Fresh Kills, or in the bargeswas the result of the aircraft crashes. But this reading goes too far, ignoring the variables of the location of the work, the time period of the work, and the nature of the tasks. In the immediate aftermath of the crashes, and the terrible fires and tragic building collapses that resulted, there was a frantic effort to locate survivors in the thousands of tons of rubble produced by the collapse of the Twin Towers and nearby buildings. Tragically, very few people were rescued, none after September 12, 2001. Five days after the attacks, Mayor Giuliani acknowledged that the "recovery effort continues and the hope is still there that we might be able to save some lives ... [b]ut the reality is that in the last several days we haven't found anyone." Dan Barry, After the Attacks: The Tally, N.Y. Times, Sept. 17, 2001, at A12. Nevertheless, the search for the living continued. By September 29, 2001, that predominant task officially ended and workers' efforts were focused on demolition of the ruined structures of the Towers, removal of thousands of tons of debris, and clean-up of the World Trade Center site, lasting another eight months, through May 2002. See Appendix F. In the beginning, the urgent search for survivors overshadowed all else. Gradually, a sense of order developed, demolition and clean-up ensued in the ways such tasks are performed, the acrid smoke that hung as a pall over Manhattan and Brooklyn dissipated, businesses in the area resumed to function, and people returned to their apartment residences. These differences affect the nature of the claims presented to me and the jurisdictional determination I must make.
The doctrine of federal preemption begins "with the starting presumption that Congress does not intend to supplant state law." Travelers, 514 U.S. at 654-55, 115 S.Ct. 1671, and goes on to consider Congress' motivations for enacting the particular federal law that is to be examined. "The question whether a certain state action is pre-empted by federal law is one of congressional intent. `The purpose of Congress is the ultimate touchstone.'" Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 208, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985) (citations omitted). Preemption cases like Caterpillar and Travelers teach that courts must closely examine the relationship between the purpose of the federal law and the state law claims at issue and draw the jurisdictional boundary at the point where the federal interest wanes and strong state interests re-emerge. Congress could not have intended for every claim, no matter how distant from the attacks, to be brought into federal court, displacing strong and historic state interests and the traditional role of the state judiciary.
The beginning jurisprudence concerning section 408, mostly in the context of insurance, suggests a sensitivity to such state interests and a reluctance to apply the literal breadth of the Act's jurisdictional terms. The issue in Canada Life Assurance Co. v. Converium Ruckerversicherung (Deutschland) AG, 210 F.Supp.2d 322, *373 329-30 (S.D.N.Y.2002), involved a dispute between a reinsurer and its retrocessionaire concerning losses arising out of the terrorist-related crashes of September 11, 2001. Notwithstanding the subject of the dispute and the literal breadth of section 408(b), the district court held, nevertheless, that federal jurisdiction did not exist. See also Associated Aviation Underwriters v. Arab Ins. Group (B.S.C.), No. 02 Civ. 4893, 2003 WL 1888731 (S.D.N.Y. Apr.16, 2003); Hudson News Co. v. Federal Ins. Co., 258 F.Supp.2d 382 (D.N.J. 2003); SR Int'l Bus. Ins. v. World Trade Center Props. LLC, Nos. 01 Civ. 9291, 02 Civ. 0017, 2002 WL 1905968 (S.D.N.Y. Aug.19, 2002) (holding that the Act did not preclude the exercise of contractual rights to appraisal or arbitration); Goodrich Corp. v. Winterthur Int'l America Ins. Co., No. 5:02CV367, 2002 WL 31833646 (N.D.Ohio June 17, 2002); 730 Bienville Partners, Ltd. v. Assurance Co. of America Int'l, No. CIV.A. 02-0106, 2002 WL 985809 (E.D.La. Apr.16, 2002). Similarly, the court in International Fine Art and Antique Dealers Show Ltd. v. ASU International, Inc. held that an action seeking a declaration of rights under an event cancellation policy did not fall within section 408(b)(3). No. 02 Civ. 534, 2002 WL 1349733 (S.D.N.Y. June 20, 2002). Although the disaster of September 11, 2001 caused the cancellation of two events organized by the plaintiffs, the court noted that the events were "not scheduled to occur on or close to the scenes of destruction of September 11," and thus the dispute was "too remote from the terrorist attacks of September 11 to come within [the Act's] reach." Id. at *6. My earlier decisions, Graybill v. City of New York, 247 F.Supp.2d 345 (S.D.N.Y.2002), and Spagnuolo v. Port Auth. of N.Y. and N.J., 245 F.Supp.2d 518 (S.D.N.Y.2002), likewise held that common workplace injuries in the demolition and clean-up efforts at the World Trade Center did not cease to be governed by traditional state law, and should be decided in the traditional state court, the New York Supreme Court.
Plaintiffs base their lawsuits principally on sections 200 and 241 of the New York Labor Law, among other laws and regulations. Section 200 provides that workplaces "shall be so constructed, equipped, arranged operated and conducted as to provide reasonable and adequate protection to the lives, health and safety of all persons employed therein or lawfully frequenting such places"; "[a]ll machinery, equipment, and devices in such places shall be so placed, operated, guarded, and lighted as to provide reasonable and adequate protection to all such persons." N.Y. Lab. Law § 200 (2003). Section 241 states that "[a]U areas in which construction, excavation or demolition work is being performed shall be so constructed, shored, equipped, guarded, arranged, operated and conducted as to provide reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places." N.Y. Lab. Law § 241(6) (2003). The Labor Law contains scores of ancillary statutory enactments, and has been interpreted by hundreds of cases.
A congressional intent to preempt this body of state law, even by a federal statute that provides that the federal cause of action it creates "shall be derived from" substantive state law, should not lightly be presumed. Historically, the regulation of the workplace is a state function, part of traditional state police powers. New York's Labor Law, pursuant to which plaintiffs brought their suits, originated in 1909, almost a century ago. The states have a vital interest in ensuring the health and safety of employees in the workplace and have extended experience in enacting, interpreting and applying those laws. See Lochner v. New York, 198 U.S. 45, 67, 25 S.Ct. 539, 49 L.Ed. 937 (Harlan, J., dissenting) *374 (labor regulations "are questions for the State to determine, and their determination comes within the proper exercise of the police power of the State"). See also Common v. City of New York, 95 N.Y.2d 583, 721 N.Y.S.2d 579, 744 N.E.2d 114, 119 (2000) (affirming decision finding that federal maritime law did not preempt the application of New York Labor Law, "influenced by the Labor Law's strong State interest in protecting workers"). Federal preemption of such a strong and long-standing state policy should require clear Congressional intent. Somlyo v. J. Lu-Rob Enters., Inc., 932 F.2d 1043, 1045-46 (2d Cir.1991). Nor should a federal court oust the court having expertise interpreting this statutehere, the New York Supreme Court[8]without a more definite statement of congressional intent.
On September 29, 2001, the City recognized that there could be no more survivors, and the hope and specific search for survivors officially ceased. The dominating goal of the contractors and workers at the site and elsewhere became demolition and clean-up. I hold that September 29, 2001 is a proper demarcation point and the World Trade Center site is a proper geographical limitation for considering federal jurisdiction, and that up to that date, injuries that were suffered at the World Trade Center arose out of, resulted from and were related to the terrorist-related aircraft crashes. After that point, or outside the World Trade Center site, the goals of demolition, clean-up and removal of debris were dominant, the traditional state interest in regulating the health and safety of employees in the work place re-emerged, and any federal interest in displacing traditional state police powers waned. Accordingly, claims arising out of demolition, clean-up, and removal activities after September 29, 2001 became "too tenuous, remote or peripheral" from federal concerns to warrant a finding that the law arises out of, results from, or relates to the September 11 terrorist-related aircraft crashes. Shaw, 463 U.S. at 100 n. 21, 103 S.Ct. 2890. The concerns of federalismthe proper balance between federal and state interestsstrongly weigh against imputing a congressional intent to displace "a whole panoply of state law" absent some clearly expressed directive. Painters of Phila. Dist. Council No. 21 Welfare Fund v. Price Waterhouse, 879 F.2d 1146, 1153 n. 7 (3d Cir.1989). Accordingly, I hold that claims alleging respiratory injuries suffered at the World Trade Center site, up to and including September 29, 2001, are preempted by section 408 of the Act, and that claims incurred after that date or at different sites are not preempted.[9]
The structure of the statute supports this interpretation. Congress provided two options to claimants: the Victim Compensation Fund or a traditional lawsuit. If the claimant chose to file with the Fund, that filing operated as a waiver of the right *375 to file a civil action "in any Federal or State court for damages as a result of the terrorist-related aircraft crashes of September 11, 2001." Act §§ 405(c)(3)(B), 408(a)(3).[10] Conversely, if the party had already filed a court suit, and did not withdraw it within ninety days following the promulgation of the regulations that set up the Victim Compensation Fund, that party was not allowed to file a claim with the Fund. Id. As Senator Don Nickles observed: "[Title IV] basically says that victims and/or their family survivors, people who were killed by the terrorist act of September 11, may receive financial assistance or at least have legal recourse. They can do it either by suing in a Federal district court or they can do it through a new system we are now creating in this legislation called the special master." 147 Cong. Rec. S9602 (Sept. 21, 2001).
Several courts have reasoned that the temporal and geographic limitations placed on eligibility to the Victim Compensation Fund could also apply to defining federal jurisdiction. "Congress predominantly intended to create the federal cause of action in § 408(b)(1) and its corresponding venue clause, § 408(b)(3), for tort actions brought by individuals (or their representatives), who were on board one of the hijacked airplanes or who were present at the crash site at the time of or in the `immediate aftermath' of the crashes, against all entities that could be held liable either for not preventing the attacks, or for the extent of the damage they caused, or negligently allowed to occur." See Hudson News Co., 258 F.Supp.2d at 388-89. See also 730 Bienville Partners, Ltd., 2002 WL 985809 at *l-2; Combined Ins. Co. of America v. Certain Underwriters at Lloyd's London, No. 01 Civ. 10023, 2002 WL 31056851, at *1 (S.D.N.Y. Sept. 13, 2002); Int'l Fine Art and Antique Dealers Show Ltd., 2002 WL 1349733 at *5. However, section 405(c)(2)'s limitations of "present at the World Trade Center site" "at the time, or in the immediate aftermath" of the attacks are not explicitly contained in the provisions for a federal cause of action, see Act § 408(b)(1), or for exclusive jurisdiction in the United States District Court for the Southern District of New York, see Act § 408(b)(3).[11] My holding today gives appropriate weight to the two policies expressed in the statuteone being the policy of providing victims of September 11 the choice of compensation from the fund or a suit in federal court, and the other being the policy of creating a broader federal cause of action and extending liability caps to the nonterrorist defendants in September 11-related litigation.
The definitions for determining eligibility of claimants to the Victim Compensation Fund are not necessarily determinative of the temporal limits that should define the claims that arise out of, result from, or relate to the terrorist-related aircraft crashes. Indeed, I find them to be too restrictive with regard to the congressional intent to protect the City against excessive liability.[12] Different policies lie behind the *376 congressional provision of no-fault compensation from public funds, and limitations on aggregate recoveries of damages against the City in lawsuits. Furthermore, only claims of individuals suffering "physical harm or death as a result of the "terrorist-related aircraft crashes of September 11, 2001" can be made to the Fund, Act § 405(c)(2)(A)(ii), while claims for "loss of property, personal injury, or death" can be the basis of a lawsuit, Act § 408(b)(3). The claims cognizable in a lawsuit and preemptive of state causes of action appear to be broader than the claims that can be made by eligible claimants to the Fund, and not all the limitations associated with claims to the Fund are appropriate in relation to claims which may be made the bases of lawsuits.[13]
In Graybill, I drew on the tort concept of proximate causation to guide judicial interpretation of the jurisdictional scope of the Act. Proximate cause limits liability to the expected, natural or foreseeable consequences of allegedly negligent conduct. See Cumberland Oil Corp. v. Thropp, 791 F.2d 1037, 1044 (2d Cir. 1986); Clark v. New York City Hous. Autk, 277 A.D.2d 338, 717 N.Y.S.2d 216, 217 (N.Y.App.Div.2000). In this group of cases, the concept of proximate causation also helps to inform the reach of federal jurisdiction and federal law, showing that the complete chain of events that followed the collapse of the World Trade Center towers is not subsumed by the Act. I determined in Graybill that the injuries suffered by the plaintiff were far enough removed from the circumstances of September 11 as not to have been caused by the terrorist-related aircraft crashes. 247 F.Supp.2d at 351-52. The same analysis holds true here. The terrorist-related aircraft crashes into Towers One and Two caused their collapse and the intensive fires, clouds of dust, and mountains of debris that followed. The heroic efforts by firefighters, police officers and co-workers to rescue people in the buildings, and the frantic search by firefighters, police officers, clean-up workers and volunteers for survivors were expected, natural and foreseeable consequences of the crashes. If negligence on the part of the Port Authority or the City contributed to deaths or injuries in the buildings or in the efforts to rescue survivors, there still would be a proximate, causal relationship between acts and omissions of the City or the Port Authority and the plaintiffs' injuries, even though the terrorist-related aircraft crashes of September 11, 2001 set all these *377 forces in motion. Exclusive jurisdiction in the federal court under the Act would exist. If, however, death or injury occurred as demolition and clean-up efforts proceeded after September 29, 2001, the causal relationship with the terrorist-related aircraft crashes becomes attenuated, and duties and responsibilities associated with the workplace become predominant. In the latter set of cases, the fact-finding and determinative rulings are better made in the traditional forum, the New York Supreme Court, pursuant to the standards reflected in the New York Labor Law.[14]
Plaintiffs and defendants have put forth positions either eliminating or maximizing federal jurisdiction. Plaintiffs acknowledge that the disaster scene was certainly unprecedented in terms of its cause and magnitude, but contend that the unique conditions presented by the attacks of September 11 are relevant, not to jurisdiction, but to the reasonableness of defendants' conduct in the circumstances confronting them after September 11. Plaintiffs argue that Congress accepted that the duties imposed on employers by the Labor Law to guard the safety of workers at the site would govern defendants' conduct. Sections 405(c)(3)(B)(i) and 408(a)(3) of the Act, requiring individuals who submit claims to the Fund to waive their right to file a civil action "in any Federal or State court for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001," constitutes recognition that at least some individuals who are eligible to file Fund claims would be able to pursue actions in state court, free from the preemptive effect of section 408. This interpretation would result in the remand of all of these cases, even those brought by plaintiffs who suffered respiratory injury on September 11, 2001.
Defendants argue that the respiratory injuries alleged by the plaintiffs resulted from the unique conditions presented by the terrorist-related aircraft crashes, that the conditions encountered were unprecedented, larger in scale, longer in duration, and presenting hazards far beyond conventional emergency situations. The City represents that it had inadequate stocks of appropriate safety equipment on hand to cope with the unique conditions at the several sites. Furthermore, defendants state that the disaster sites, including Fresh Kills and the debris transfer stations in Brooklyn and Manhattan, were also crime scenes, calling for careful methods of collecting and preserving evidence, inconsistent with the use of more mechanized and remote methods of demolition, clean-up, and disposal of debris in landfills.
Defendants, as the proponents of preemption, have the burden to persuade as to the applicability of section 408 of the Act. They are not able to do so, beyond the period of rescue and search for survivors at the World Trade Center site. Those working at the World Trade Center site as part of the rescue effort were focused on the immediate and central jeopardy created by the hijackings and crashesthe endangerment of human lives; any injuries incurred by exposure to airborne contaminants during the search for survivors fall within the range of claims in which the effects of the terrorist-related aircraft crashes predominated. At other sites, or after this period, the focus of the activities was clean-up, and the conditions that predominated were those of a demolition site, governed by the Labor Law as interpreted and enforced by the New York Supreme Court.
*378 Clearly, Congress intended to provide relief to the City with respect to limiting its liability resulting from the September 11, 2001 attacks, and the interpretation of the preemptive provision of the Act must give a reasonable scope to that intention. The City was aware of its potential liability based on workers' respiratory illnesses at least a month before it sought amendment of the Act. See Alan G. Hevesi, Office of the Comptroller of the City of New York, Preliminary Estimate: The Impact of the September 11 WTC Attack on NYC's Economy and City Revenues 10-11 (Oct. 4, 2001). The cap on City liability that Congress provided must be interpreted in a manner that is responsive to the City's petition to Congress.
The Act and its legislative history show, however, that the interest of Congress was focused on claims of those immediately involved in the terrorist-related aircraft crashes and the tasks following in their immediate aftermath, like the firefighters and police officers who were involved in the attempts to rescue victims. The activities of those who followed, like ironworkers, sanitation workers, engineers, and the numerous other laborers who participated in the lengthy demolition and clean-up efforts, did not appear to have been considered by Congress. The legislative history does not support an understanding that all claims against the City and the Port Authority should be preempted, covered by the cap on aggregate liability.[15] The language of section 408(b)(3) is broad, but not boundless. The requirements of federalism, in the absence of clear congressional intent, command due regard for long-established and traditionally enforced state law, such as the well-recognized power of the state to regulate the health and safety of the workplace. Accordingly, neither the expansive view of preemption advocated by defendants, nor the restrictive view urged by plaintiffs, is correct.
Defendants rely on cases like In re TMI Litig. Cases Consol. II, 940 F.2d 832, 854-55, 857 (3d Cir.1991), and Acuna v. Brown & Root, Inc., 200 F.3d 335, 339^0 (5th Cir.2000), interpreting the Price-Anderson Amendments Act of 1988. The Price-Anderson Act preempts suits "arising out of or resulting from a nuclear incident," 42 U.S.C. § 2210(n)(2), and gives a detailed definition of "nuclear incident": "any occurrence, including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material," 42 U.S.C. § 2014(q) (2003). Congress expressed its belief that if it did not act to preempt all claims related to nuclear energy, there would be potential for large and inconsistent verdicts, discouraging private entities from entering the field of nuclear energy. See In re TMI Litig. Cases Consol II, 940 F.2d at 852. In contrast, the Air Transportation Safety and System Stabilization Act does not define the cause of action that it creates or the scope of federal jurisdiction that it confers. The nuclear energy cases do not help the defendants' arguments.
Furthermore, consolidating all of these respiratory-injury cases in federal court would not further the expressed congressional *379 purpose to promote litigation efficiency and consistency of judgments by concentrating all lawsuits exclusively in the United States District Court for the Southern District of New York. Under New York law, the statute of limitations for personal injury is three years, see N.Y. C.P.L.R. 214-c (2003); however, the Port Authority consents to suits brought only within one year, see N.Y. Unconsol. Law § 7107 (2003), and the City to suits brought within one and a half years, see N.Y. Gen. Mun. Law § 50-i (2003). The statute of limitations for personal injuries resulting from exposure to and inhalation of contaminants does not begin to run until the date of discovery of the injury by the plaintiff or from the date that discovery should have been made through reasonable diligence, whichever is earlier. N.Y. C.P.L.R. 214-c (2003). Thus, for years to come, respiratory injury cases like those before me can be filed, in this court and by removal from the Supreme Court, resulting in uncertainty, duplicative and repetitive proceedings, and litigation inefficiency. It is also unclear how the cap on liability can be administered if new cases are continuously filed, and the final award and judgment cannot be ascertained for years to come. This uncertainty will affect and hamper the management of cases brought by those killed on the ground and in the planes on September 11; in that group of cases, the statute of limitations began to run on September 11, and thus the number of claims brought will shortly be known. However, because some defendants  such as the Port Authority  are or could be named in both groups of final damages award as to these defendants cannot be entered until judgments are reached in all of the respiratory injury claims. As the scope of preemption expands, the efficiency of the management of all September 11-related litigation necessarily decreases, prolonging the proceedings.
Accordingly, for the reasons stated, I hold that the claims of plaintiffs alleging respiratory injuries caused by exposure to contaminants in the demolition and cleanup efforts at the World Trade Center site, up to and including September 29, 2001, arise out of, result from, and are related to the terrorist-related aircraft crashes, are governed by federal law, and are exclusively within the jurisdiction of this court pursuant to section 408 of the Act. Claims arising from exposure after September 29, 2001, or at sites other than the World Trade Center, must be remanded to the New York Supreme Court, unless an independent ground of federal jurisdiction exists.

iii Supplemental Jurisdiction over State Law Claims
Some plaintiffs allege that they worked at the World Trade Center site and were exposed to contaminants before and after September 29, 2001. Because the cause of action accrues upon exposure, they may have both federal and state causes of action. However, under section 408(b)(2), the same state law that will govern the cause of action after September 29, 2001 essentially will govern the federal cause of action as well, because "the substantive law for decision in [the federal] suit shall be derived from the law ... of the State in which the crash occurred unless such law is inconsistent with or preempted by Federal law."
Pursuant to 28 U.S.C. § 1367, the district courts have supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy...." The suits before me present such related claims. They share a common factual basis and will be governed by essentially the same substantive law. See Act § 408(b)(2).
*380 In the suits before me, groups of plaintiffs, believing that they were similarly situated, have joined their separate claims into single lawsuits. Many of the pleadings are vague as to the precise dates when, and places where, particular claimants worked and suffered exposure to contaminants. Further proceedings to implement this order, to separate claims that will remain in this court and those that should properly be remanded, are respectfully referred to the Honorable Theodore H. Katz, United States Magistrate Judge.
As a guide to such implementing proceedings, I attach appendices that categorize the complaints to the extent that plaintiffs' allegations enable me to do so. First, I grant plaintiffs motion to amend the complaint in Flechaus v. City of New York, 03 Civ. 008 and, as amended, I order the case remanded. I list, in Appendix A, the cases that must be remanded. In Appendix B, I list the cases that appear to allege federal causes of action (including state causes of action over which I have supplemental jurisdiction), and with regard to which plaintiffs' motions to remand are denied. Appendix C lists cases which appear not to be preempted by the Act, but with regard to which motions to remand have not been made. Further proceedings are necessary to determine if they also should be remanded pursuant to 28 U.S.C. § 1447(c). Appendix D lists another group of cases which appear to allege federal causes of action, and in which no motions to remand were made. Finally, I list in Appendix E the cases where I am not able to ascertain sufficiently when or where plaintiffs worked and suffered exposure and, consequently, if their causes of action arise under federal or state law. They should also be evaluated in further proceedings.
Because plaintiffs listed in Appendices C and D have not made any motions in their cases, they may file submissions by July 18, 2003 addressing whether their cases are appropriately remanded or kept in federal court according to the ruling set forth in this Opinion. Plaintiffs in Appendix E must file submissions clarifying whether this court retains jurisdiction over their cases by July 18, 2003. In cases like Baiano v. City of New York, 03 Civ. 0193, where some plaintiffs are subject to federal jurisdiction and some plaintiffs are not, counsel shall sever the cases appropriately. Defendants may file responses to any submissions made by the plaintiffs by August 8, 2003. In all instances, courtesy copies of all submissions should be sent to the Honorable Theodore H. Katz and to me.

III. Conclusion
For the reasons stated, those plaintiffs who were exposed to contaminants while working at the World Trade Center site up to and including September 29, 2001 may proceed in this court with their federal cause of action. To the extent that plaintiffs who fall within federal jurisdiction also have state causes of action based on exposures at sites outside of the World Trade Center or on dates after September 29, 2001, their causes of action will be within the supplemental jurisdiction of this court. Those plaintiffs bringing claims only for exposures after September 29, 2001 or at sites other than the World Trade Center do not fall within this court's exclusive jurisdiction and their cases will be remanded.

IV. Certification for Interlocutory Appeal
The Port Authority has requested that I certify the question presented by these motions for interlocutory appeal. 28 U.S.C. § 1292(b) permits district judges to certify an order for interlocutory appeal when they are "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially *381 advance the ultimate termination of the litigation." The scope of federal jurisdiction in these cases involves a controlling question of law as to which there is a substantial ground for difference of opinion. An immediate appeal also may materially advance the ultimate termination of the litigation, for "it will resolve the basic question of jurisdiction and thereby avoid uncertainty as to the binding effect of determinations and potential duplication of proceedings.
However, certifications are available only with respect to cases remaining in this court, and not those subject to an order of remand. 28 U.S.C. § 1447(d) provides:
An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise, except that an order remanding [certain civil rights cases] to the State court ... shall be reviewable....
See also Things Remembered, Inc. v. Petrarca, 516 U.S. 124, 126-29, 116 S.Ct. 494, 133 L.Ed.2d 461 (1995); Excimer Assoc., Inc. v. LCA Vision, Inc., 292 F.3d 134, 138 (2d Cir.2002). Section 1447(d)'s prohibition of review "on appeal or otherwise" includes interlocutory appeals. See Bishop v. General Motors Corp., 925 F.Supp. 294, 302 (D.N.J.1996). See also 15 James Wm. Moore et al., Moore's Federal Practice ¶ 203.31 (3d ed.1997). But cf. In re TMI Litig, Cases Consol. II, 940 F.2d 832, 836 (3d Cir.1991) (allowing for interlocutory appeal of a remand order where the constitutionality of the federal law was at issue).
This is an unusual case. If my order is incorrect, and preemption and the scope of federal jurisdiction are more extensive or more limited than I have held, the legitimacy of further proceedings in the New York Supreme Court and in this court will be in doubt. The correct rule of decision in the cases remaining before me may also be called into question. Thus, I will stay the remand of cases pending review by the Court of Appeals over the cases remaining before me.
Accordingly, I certify this order for interlocutory appeal under section 1292(b). The remand orders shall be stayed pending decision by the Court of Appeals on the section 1292(b) certificate, and issuance of a mandate thereafter.
SO ORDERED.

Appendix ACases Subject to Partial or Total Remand (motions for remand granted but stayed)

__________________________________________________________________________________________________
Docket No. Plaintiff Exposure Onset Work site
___________________________________________________________________________________________________
02 Civ. 8938 Beyer, Clinton
 Beyer, Joan (spouse) 11/15/2001 World Trade Center
___________________________________________________________________________________________________
02 Civ. 8938 Blake, Peter
 Blake, Sharon (spouse) 10/15/2001 World Trade Center
___________________________________________________________________________________________________
03 Civ. 008 Flechaus, Kim 10/08/2001 World Trade Center
___________________________________________________________________________________________________
03 Civ. 0193 Biggs, Jack A. 59th Marine Transfer Station
 ["59th MTS"]
_______________________________________________________________________________________________________
03 Civ. 0193 Bou, John Fresh Kills
_______________________________________________________________________________________________________
03 Civ. 0193 Brown, Wayne 59th MTS
_______________________________________________________________________________________________________
03 Civ. 0193 Carannante, Robert Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 0193 Carpentier, Victor Fresh Kills
________________________________________________________________________________________________________
03 Civ. 0193 Damitz, Gerald Fresh Kills
___________________________________________________________________________________________________________
03 Civ. 0193 DelBianco, Anthony Hamilton Ave. MTS
________________________________________________________________________________________________________________

*382
____________________________________________________________________________________________________________
Docket No. Plaintiff Exposure Onset Work site
____________________________________________________________________________________________________________
03 Civ. 0193 Donovan, Daniel Fresh Kills
________________________________________________________________________________________________________________
03 Civ. 0193 Edwards, Roy Hamilton Ave. MTS
_______________________________________________________________________________________________________________
03 Civ. 0193 Giordano, Anthony Hamilton MTS
____________________________________________________________________________________________________________
03 Civ. 0193 Guidicipietro, Michael Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 0193 Gutierrez, Rafael 59th MTS
____________________________________________________________________________________________________________
03 Civ. 0193 Irby, Pelops Hamilton Ave. MTS
____________________________________________________________________________________________________________
03 Civ. 0193 Johnson, Austin C. 59th MTS
____________________________________________________________________________________________________________
03 Civ. 0193 Keenan, Jason Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 0193 Malave, Omar 59* MTS
____________________________________________________________________________________________________________
03 Civ. 0193 Maldonado, Daniel 59th MTS
____________________________________________________________________________________________________________
03 Civ. 0193 Menoni, John Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 0193 Mullaney, Martin Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 0193 Nardiello, Mickey Hamilton MTS
____________________________________________________________________________________________________________
03 Civ. 0193 Ozello, Frank Hamilton MTS/Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 0193 Pankey, John 59"> MTS/135th Marine
____________________________________________________________________________________________________________ Transfer Station
03 Civ. 0193 Paranscandola, Hamilton MTS/Fresh
 Nicholas Kills/59th MTS/Pier 25/Pier 6
____________________________________________________________________________________________________________
03 Civ. 0193 Parise, Vincent Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 0193 Rullan, Juan 59th MTS
____________________________________________________________________________________________________________
03 Civ. 0193 Salomone, John Hamilton MTS
____________________________________________________________________________________________________________
03 Civ. 0193 Solomon, Alexis 59th MTS/Hamilton MTS
____________________________________________________________________________________________________________
03 Civ. 0193 Trembone, Christian Fresh Kills/Hamilton
 MTS/59'h MTS/Pier 25/Pier 6
__________________________________________________________________________________________________________________

Appendix BCases Partially or Totally within Federal Jurisdiction (motions for remand denied)

___________________________________________________________________________________________________________________________
Docket No. Plaintiff Exposure Onset Work site
_________________________________________________________________________________________________________________________________
02 Civ. 8092 Bel, Johan 09/18/2001 World Trade Center
____________________________________________________________________________________________________________
02 Civ. 8092 Quinlan, William
 Quinlan, Bertha (spouse) 09/12/2001 World Trade Center
____________________________________________________________________________________________________________
02 Civ. 8092 Sweeney, James
 Sweeney, Kathleen (spouse) 09/14/2001 World Trade Center
____________________________________________________________________________________________________________
02 Civ. 8092 McCue, William D.
 McCue, Maureen (spouse) 09/12/2001 World Trade Center
____________________________________________________________________________________________________________
02 Civ. 8434 Hickey, Thomas
 Hickey, Francis (spouse) 09/13/2001 World Trade Center
____________________________________________________________________________________________________________
02 Civ. 9126 McNally, Vincent
 McNally, Gina (spouse) 09/21/2001 World Trade Center
____________________________________________________________________________________________________________
02 Civ. 9126 Lavery, Francis
 Lavery, Kathryn (spouse) 09/29/2001 World Trade Center
____________________________________________________________________________________________________________
02 Civ. 9127 Ariola, Joseph
 Ariola, Colleen (spouse) 09/11/2001 World Trade Center
____________________________________________________________________________________________________________
02 Civ. 9127 Blake, James 09/11/2001 World Trade Center
____________________________________________________________________________________________________________
02 Civ. 9127 Deneau, John M. 09/13/2001 World Trade Center
 Deneau, Lisa (spouse)

*383
____________________________________________________________________________________________________________
Docket No. Plaintiff Exposure Onset Work site
____________________________________________________________________________________________________________
-------------------------------------------------------------------------------------------------------------
02 Civ. 9127 Healy, Joseph 09/11/2001 World Trade Center
 Healy, Janet (spouse)
____________________________________________________________________________________________________________
02 Civ. 9127 Lamoreaux, George 09/16/2001 World Trade Center
 L amoreaux, Ingrid (spouse)
____________________________________________________________________________________________________________
02 Civ. 9127 Magee, Thomas 09/11/2001 World Trade Center
____________________________________________________________________________________________________________
02 Civ. 9127 Malloy, Patrick 09/14/2001 World Trade Center
 Malloy, Lori (spouse)
____________________________________________________________________________________________________________
02 Civ. 9127 McGillick, Jon 09/13/2001 World Trade Center
 McGillick, Arlene (spouse)
____________________________________________________________________________________________________________
02 Civ. 9127 Spiller, Michael 09/11/2001 World Trade Center
 Spiller, Leah (spouse)
____________________________________________________________________________________________________________
02 Civ. 9127 Villari, Timothy 09/12/2001 World Trade Center
 Villari, Maria (spouse)
____________________________________________________________________________________________________________
02 Civ. 9127 Larosa, Anthony R. 09/13/2001 World Trade Center
 Larosa, Angela (spouse)
____________________________________________________________________________________________________________
02 Civ. 9127 Danvers, Roger 09/15/2001 World Trade Center
____________________________________________________________________________________________________________
02 Civ. 9127 Mascarella, James 09/12/2001 World Trade Center
____________________________________________________________________________________________________________
02 Civ. 9127 Taggart, John F. 09/12/2001 World Trade Center
 Taggart, Theresa (spouse)
____________________________________________________________________________________________________________
02 Civ. 9128 Blake, James 09/11/2001 World Trade Center
____________________________________________________________________________________________________________
02 Civ. 9128 Villari, Timothy 09/12/2001 World Trade Center
 Villari, Maria (spouse)
____________________________________________________________________________________________________________
03 Civ. 0193 Baiano, John 09/11/2001 WTC/Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 0193 Brannick, Kevin 09/12/2001 WTC/Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 0193 Ceserano, Alan 09/11/2001 WTC/Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 0193 Conlon, Michael 09/11/2001 WTC/Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 0193 Dinotte, Lenny 09/12/2001 WTC/59*h MTS
____________________________________________________________________________________________________________
03 Civ. 0193 Garcia, Nelson 09/12/2001 WTC/Fresh
 Kills/Hamilton Ave.
 MTS/59th MTS
____________________________________________________________________________________________________________
03 Civ. 0193 Goffredo, Robert 09/11/2001 WTC/Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 0193 Havell III, Otto 09/12/2001 WTC/Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 0193 Henri, Robert 09/11/2001 WTC/Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 0193 Kempton, Kevin 09/12/2001 WTC/Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 0193 Perry, Thomas 09/11/2001 WTC/Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 0193 Pizzarello, Jerry 09/11/2001 WTC/Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 0193 Russo, Raymond 09/11/2001 WTC/Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 0193 Snyder, George 09/11/2001 WTC/Fresh Kills
____________________________________________________________________________________________________________

Appendix CCases to be Remanded for Lack of Subject Matter Jurisdiction (no motions for remand made)

____________________________________________________________________________________________________________
Docket No. Plaintiff Exposure Onset Work site
____________________________________________________________________________________________________________
03 Civ. 0912 Hendrickson, David Fresh Kills
 Hendrickson, Lynn (spouse)
____________________________________________________________________________________________________________
03 Civ. 2067 Maksimowich, Jason 09/24/2001 Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 2447 Samaroo, Dewardranth 10/06/2001 World Trade Center

*384
____________________________________________________________________________________________________________
Docket No. Plaintiff Exposure Onset Work site
_____________________________________________________________________________________________________________
--------------------------------------------------------------------------------------------------------------
03 Civ. 2623 Berardi, Joseph 09/24/2001 Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 3040 Hartey, Teresa A. 10/11/2001 Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 3040 Galanek, Edward 09/24/2001 Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 3040 Melendez, James 09/24/2001 Fresh Kills
____________________________________________________________________________________________________________

Appendix DCases Subject to Federal Jurisdiction (no motions for remand made)

____________________________________________________________________________________________________________
Docket No. Plaintiff Exposure Onset Work site
____________________________________________________________________________________________________________
02 Civ. 5288 Taha, Ana L. 09/13/2001 World Trade Center
____________________________________________________________________________________________________________
02 Civ. 10273 Miller, Kelly M. 09/19/2001 World Trade Center
____________________________________________________________________________________________________________
02 Civ. 10274 Rowe, Ian 09/11/2001 World Trade Center
____________________________________________________________________________________________________________
03 Civ. 006 Dalton, Charles 09/12/2001 World Trade Center
____________________________________________________________________________________________________________
03 Civ. 007 Johnson, Robert, Jr. 09/12/2001 World Trade Center
 Johnson, Christine (spouse)
____________________________________________________________________________________________________________
03 Civ. 0194 Wilkinson, Margaret (as 09/11/2001 World Trade Center
 Administratrix of the estate of
 Glenn Wilkinson)
____________________________________________________________________________________________________________
03 Civ. 0195 O'Callaghan, Rhonda Lee (as 09/11/2001 World Trade Center
 Executrix of the estate of
 Daniel O'Callaghan)
____________________________________________________________________________________________________________
03 Civ. 2104 D'Elia, Jack J. 09/13/2001 World Trade Center
____________________________________________________________________________________________________________
03 Civ. 4064 Lazaar, Houssain 09/12/2001 World Trade Center
____________________________________________________________________________________________________________

Appendix ECases Requiring Clarification to Determine Jurisdiction

____________________________________________________________________________________________________________
Docket No. Plaintiff Exposure Onset Work site
____________________________________________________________________________________________________________
02 Civ. 10270 Adams, Kevin John et al. World Trade Center
 [all plaintiffs]
____________________________________________________________________________________________________________
02 Civ. 10271 Arsenault, Kirk et al. World Trade Center
 [all plaintiffs]
____________________________________________________________________________________________________________
02 Civ. 10272 Greenwood, Douglas et al. World Trade Center
 [all plaintiffs]
____________________________________________________________________________________________________________
02 Civ. 10275 Rementeria, John World Trade Center
 Rementeria, Maria (spouse)
____________________________________________________________________________________________________________
02 Civ. 10304 Davi, Joseph World Trade Center
____________________________________________________________________________________________________________
03 Civ. 0033 Annerino, Salvatore et al. World Trade Center
 [all plaintiffs]
____________________________________________________________________________________________________________
03 Civ. 0034 Albrecht, Barry J. et al.[16] World Trade Center
____________________________________________________________________________________________________________
03 Civ. 0035 Arocho, David et al. World Trade Center
 [all plaintiffs]
____________________________________________________________________________________________________________
03 Civ. 0036 Agugliaro, Richard et al. World Trade Center
 [all plaintiffs]
____________________________________________________________________________________________________________
03 Civ. 0037 Stephenson, Leon at al. World Trade Center
 [all plaintiffs]
____________________________________________________________________________________________________________
03 Civ. 0038 Accardo, Anthony et al. World Trade Center
 [all plaintiffs]

*385
____________________________________________________________________________________________________________
Docket No. Plaintiff Exposure Onset Work site
____________________________________________________________________________________________________________
------------------------------------------------------------------------------------------------------------
03 Civ. 0193 Bonvicino, John 09/11/2001 WTC/Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 0193 Costarella, Phyllis 09/11/2001 WTC/Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 0193 Falcone, Joseph 09/11/2001 WTC/Fresh Kills
____________________________________________________________________________________________________________
03 Civ. 2621 Fucella, Daniel World Trade Center
 Fucella, Maria (spouse)
____________________________________________________________________________________________________________
03 Civ. 2622 McGrory, Robert J. World Trade Center
____________________________________________________________________________________________________________
03 Civ. 3040 Esposito, Robert
____________________________________________________________________________________________________________
03 Civ. 3040 Esposito, Denise
____________________________________________________________________________________________________________
03 Civ. 3040 Leon, Yvonne
____________________________________________________________________________________________________________

Appendix FTimeline of Events[17]

____________________________________________________________________________________________________________
DATE EVENT
____________________________________________________________________________________________________________
September 11, 2001 Rescue and recovery begins.
 [Eligibility for the Victim Compensation Fund is limited to nonrescue
 workers who were present at the site within 12 hours
 of the attacks, and to rescue workers who were present at the
 site within 96 hours of the attacks.]
____________________________________________________________________________________________________________
 September 12, 2001 Last survivors are rescued from the World Trade Center
 ("WTC") rubble.
____________________________________________________________________________________________________________
September 16, 2001 Mayor Giuliani acknowledges that the chances of finding
 survivors are minimal.
____________________________________________________________________________________________________________
September 29, 2001 Search for survivors at WTC site ends.
____________________________________________________________________________________________________________
October 29, 2001 Department of Design and Construction formally named as
 Co-Incident Commander.
____________________________________________________________________________________________________________
End of October 2001 Mayor Giuliani orders that no more than 25 firefighters and 25
 police officers should be at Ground Zero at any one time.
____________________________________________________________________________________________________________
November 14, 2001 Firm of Godosky & Gentile announces that they are pursuing
 legal action on behalf of firefighters who allegedly incurred
 respiratory injuries from exposure to the WTC disaster site.
____________________________________________________________________________________________________________
November 19, 2001 The Air Transportation Safety and System Stabilization Act is
 amended to limit liability of the City and the Port Authority.
____________________________________________________________________________________________________________
December 2001 Subterranean fires essentially extinguished (continuing to
 smolder into January 2002).
____________________________________________________________________________________________________________
May 30, 2002 Last piece of structural steel is removed from disaster site.
 End of operations at Ground Zero.
____________________________________________________________________________________________________________
July 1, 2002 The City transfers control of the WTC site back to the Port
 Authority.
____________________________________________________________________________________________________________

NOTES
[1] The cases and plaintiffs are identified and categorized in the appendices attached to this Opinion.
[2] These cases have been consolidated for pretrial proceedings as In re September 11 Litigation, 21 MC 97(AKH).
[3] These cases have been consolidated for pretrial proceedings as In re World Trade Center Disaster Site Litigation, 21 MC 100(AKH).
[4] Plaintiffs' counsel in four of these twenty-six removed actionsAnnarino v. City of New York, 03 Civ. 0033 (33 Emergency Medical Service and sanitation workers), Arocho v. City of New York, 03 Civ. 0035 (3 construction workers), Agugliaro v. City of New York, 03 Civ. 0036 (19 police officers), Accardo v. City of New York, 03 Civ. 0038 (741 firefighters) has expressed the belief that federal jurisdiction governs their suits.
[5] Defendant states that the proper defendant is World Trade Center Properties, not Silverstein Properties.
[6] Plaintiffs cannot make their allegations in two lawsuits. They should promptly elect between the suits, and voluntarily dismiss the redundant lawsuit. See Howard v. Klynveld Peat Marwick Goerdeler, 977 F.Supp. 654, 664 (S.D.N.Y. 1997).
[7] The House and Senate versions of the amendment to the Act enacted on November 19, 2001 differed with respect to the limitations of liability. The Senate version did not contain any modifications to the liability limitations contained in the original act. See Aviation Security Act, S. 1447, 107th Cong. (2001). The House version, limited the liability of any party to its insurance and did not specifically name the City or Port Authority as recipients of protection. See Airport Security Federalization Act of 2001, H.R. 3150, 107th Cong. § 201 (2001). The Committee of Conference drafted the language contained in the law as enacted, see H.R. Conf. Rep. No. 107-296, at 50-52 (2001), and provided the following explanation for its substitute:

The Conference substitute extends the liability limitations of the Air Transportation Stabilization Act to aircraft manufacturers, State port authorities, owners and operators of airports, and persons with property interests in the World Trade Center.
These provisions limit liability under the Act to the maximum level of their insurance coverage.
Any person with a property interest in the World Trade Center, as a condition to receiving liability protection under the Act, is required to satisfy all contractual obligations to rebuild or assist in the rebuilding of the World Trade Center.
The Conference substitute also limits the liability for all claims arising from the terrorist-related attacks of September 11, 2001, brought against the City of New York to the greater of the City's insurance coverage or $350,000,000.
This limitation on damages against the City of New York, however, does not apply to any non-government or private entity that is contracted with the City.
The Conference substitute also excludes entities primarily engaged in the business of airport security from its limitation on liability.
H.R. Conf. Rep. No. 107-296, at 81 (2001).
[8] Cases against the City of New York are concentrated in three Individual Assignment Parts. The cases of respiratory injury filed against the City and the Port Authority were assigned to Hon. Michael D. Stallman, Acting Justice of the Supreme Court, New York County. He was presiding over these cases before they were removed.
[9] Under New York law, damages begin to accrue for respiratory injuries upon exposure, see Schmidt v. Merchants Despatch Transp. Co., 270 N.Y. 287, 200 N.E. 824, 827 (1936), although the time to file suit may be enlarged by N.Y. C.P.L.R. 214-c to begin running on the date of discovery of the injury. Thus, exposure, not the onset of symptoms, becomes the significant marker for jurisdictional purposes. See Act § 408(b)(1) (federal cause of action for "damages arising out of the hijacking and subsequent crashes"). The dates of "direct or indirect exposure by absorption, contact, ingestion, inhalation, implantation or injection," id., are readily ascertainable and provide objective markers upon which to base jurisdictional distinctions.
[10] The reference to "federal or state court" suggests that Congress intended that state courts not be pre-empted, even for injuries arising soon after September 11, 2001.
[11] The provisions waiving the right to sue for those who file claims with the Fund are found in both sections 405(c)(3)(B)(i) and 408(a)(3), further linking the section of Title IV that discusses the Fund, section 405, with the section that provides for exclusive federal jurisdiction, section 408.
[12] The regulations for the Victim Compensation Fund define "in the immediate aftermath" as twelve hours after the crashes for workers other than "rescue workers," and ninety-six hours for "rescue workers who assisted in efforts to search for and recover victims." 28 C.F.R. § 104.2(b) (2003). Claimants to the Fund also had to be "present at the site," which the regulations define as "physically present" in the destroyed buildings or in any "contiguous" area that the Special Master determines was "sufficiently close ... that there was a demonstrable risk of physical harm resulting from the impact of the aircraft or any subsequent fire, explosions, or building collapses...." 28 C.F.R. § 104.2(e) (2003). See also Act § 404(a)(2) (authorizing the Attorney General, through the Special Master, to promulgate regulations for the administration of the Act).
[13] Plaintiffs imply that to the extent they are removed to the federal court and governed by caps on potential recoveries, yet are not eligible to apply for compensation from the Fund because of exposures later than the "immediate aftermath" of September 11, their constitutional rights are infringed. However, the Supreme Court has rejected arguments requiring equivalence between administrative and common law remedies, noting that "it is not at all clear that the Due Process Clause in fact requires that a legislatively enacted compensation scheme either duplicate the recovery at common law or provide a reasonable substitute remedy." Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 88, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). "Our cases have clearly established that `[a] person has no property, no vested interest, in any rule of the common law.'" Id. at 88 n. 32, 98 S.Ct. 2620 (quoting Munn v. Illinois, 94 U.S. 113, 134, 24 L.Ed. 77 (1877)). See also In re TMI, 89 F.3d 1106, 1113 (3d Cir. 1996); O'Conner v. Commonwealth Edison Co., 13 F.3d 1090, 1102 (7th Cir. 1994); Ducharme v. Merrill Natl Labs., 574 F.2d 1307, 1310 (5th Cir.1978). Query as to how this line of cases may apply to limitations on aggregate recoveries in lawsuits based on fault.
[14] I do not intend by this discussion to make any findings with regard to any of the substantive issues raised by the lawsuits. The issues of duty, negligence, and proximate and superceding causes remain for discovery, trial and verdict.
[15] Indeed, Mayor Giuliani acknowledged as much when he stated in his letter supporting the November amendment to the Act that "the City's urgent need for indemnification in removing debris from the World Trade Center site is not part of this legislation" and that the amendment "would solve one large part of the City's potential liability exposure" (emphasis added).
[16] 67 plaintiffs in this case recently dismissed their claims.
[17] This timeline is based on the public record and an uncontested submission from the City of New York.